145 F.2d 901 (1944)
In re KROGER'S ESTATE.
KROGER et al.
v.
COMMISSIONER OF INTERNAL REVENUE.
No. 9793.
Circuit Court of Appeals, Sixth Circuit.
December 4, 1944.
*902 Elden McFarland, of Boston, Mass., and C. Chester Guy, of Washington, D. C. (Ike Lanier, of Cincinnati, Ohio, John E. Marshall, of Washington, D. C., and Edward J. Quinn, of Chicago, Ill., on the brief), for petitioners.
Carlton Fox, of Washington, D. C. (Samuel O. Clark, Jr., Sewall Key, and Helen R. Carloss, all of Washington, D. C., on the brief), for respondent.
Before HICKS, HAMILTON, and MARTIN, Circuit Judges.
MARTIN, Circuit Judge.
The Tax Court decided that there is an $8,647,700.89 deficiency in the estate tax due from appellants as executors of the will of the decedent, B. H. Kroger. The decision of the Tax Court was grounded upon its finding that the creation by the decedent of two trusts by indenture of February 13, 1928, and the contemporaneous transfer by him of Treasury notes of $12,000,000 face value, to the nominated trustees were for the purpose of barring the lady whom he was about to marry from any statutory rights as his wife in the transferred property should she survive him, and were made in contemplation of death.
The pertinent statute applied by the Tax Court is Sec. 302(c) of the Revenue Act of 1926, 26 U.S.C.A. Int.Rev.Code, § 811 (c) which provides:
"The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated

* * * * * * *
"(c) To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death, * * * except in case of a bona fide sale for an adequate and full consideration in money or money's worth."
In McGrew's Estate v. Commissioner of Internal Revenue, 6 Cir., 135 F.2d 158, 160, we pointed to the holding of the Supreme Court in Colorado Nat. Bank v. Commissioner of Internal Revenue, 305 U. S. 23, 59 S.Ct. 48, 83 L.Ed. 20, that the decision of the Board of Tax Appeals (now the Tax Court) as to whether a transfer was made in contemplation of death is a question of fact upon which the decision of *903 the Board, if supported by substantial evidence, is conclusive. In demonstrating the limited power of Circuit Courts of Appeal upon review of issues of fact in tax cases, we quoted (135 F.2d pages 160, 161) from Wilmington Trust Co. v. Helvering, 316 U.S. 164, 168, 62 S.Ct. 984, 986, 86 L.Ed. 1352, as follows: "It is the function of the Board, not the Circuit Court of Appeals, to weigh the evidence, to draw inferences from the facts, and to choose between conflicting inferences. The court may not substitute its view of the facts for that of the Board. Where the findings of the Board are supported by substantial evidence they are conclusive. [Citing cases.] Under the statute the court may modify or reverse the decision of the Board only if it is `not in accordance with law.'" See 44 Stat. 110, Sec. 1003(b), 26 U.S.C.A. Int.Rev.Code, § 1141(c) (1).
We listed other decisions of the Supreme Court to the same effect and referred to our case of Crowell v. Commissioner, 6 Cir., 62 F.2d 51, 53. To these authorities should now be added another from the highest source prescribing even more sweeping inhibitions upon the Circuit Courts of Appeal in reviewing the Tax Court. See Dobson v. Commissioner of Internal Revenue, 320 U.S. 489, 502, 64 S.Ct. 239, rehearing denied, 321 U.S. 231, 64 S.Ct. 495, where the mandate was given that "when the court cannot separate the elements of a decision so as to identify a clear-cut mistake of law the decision of the Tax Court must stand."
With these legal principles in mind and with the understanding that whether a gift inter vivos was made in contemplation of death within the meaning of a Revenue Act depends upon the dominant motive of the donor in the light of the circumstances of the case, United States v. Wells, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867, we consider the insistence of appellants that the decision of the Tax Court should be reversed and the case remanded with instructions to redetermine the deficiency by excluding from the gross estate the value of the property transferred to the two trusts established by the instruments of February 13, 1928.
Appellants urge that there is no substantial evidence in the record to support the Tax Court's finding that the transfers in trust were made in contemplation of death; and assert that, on the contrary, the transfers were made by the decedent in contemplation of and in preparation for his marriage and were not and could not have been substitutes for testamentary disposition.
A biography of B. H. Kroger, whose vigorous life spanned from early in 1860 to midsummer in 1938, would doubtless stimulate any American youth ambitious to become a merchant-prince. The open sesame to Kroger's great wealth was the merchandising of food. At an early age, he engaged in the grocery business in his native city, Cincinnati, Ohio. Steadily growing and prosperous, the business was incorporated in 1902 under the name of Kroger Grocery & Baking Co., which became forthwith owner and operator of 30 stores. A quarter-century later, this company was operating 6,000 stores. Throughout this full period, Kroger had been the principal stockholder and the president of the company.
Upon completion of 25 years' successful operation of the company, Kroger received in late 1927 an offer for his stockholdings at a price which he considered so much in excess of its intrinsic value that he "could not afford to refuse it." So, in January, 1928, he sold his stock for $24,397,000 cash, and invested this sum largely in United States government securities.
While accumulating a fortune from the successful conduct of the grocery business, Kroger became interested in banking also, first as a substantial stockholder and director of the Provident Savings Bank & Trust Co., Cincinnati, Ohio, and in 1901 as president of that institution. In 1926 he was appointed a director of the Federal Reserve Bank of Cincinnati and served in that capacity until 1936. After selling his stock in the Kroger Grocery & Baking Co., he resigned as its president and also as president of the bank, but retained his official capacity as Chairman of the Board in both institutions.
Even during his active career, this dynamic business man was no slave to his desk. He took time out for exercise and recreation and kept himself physically fit, playing for some twenty years in a regular foursome 18 holes of golf almost daily over the hilly course of the Cincinnati Country Club. With pardonable pride, a one-time Treasurer of the United States testified that while Mr. Kroger took his game seriously, he was "only a fair golfer" and that the Treasurer  if not the Treasury  "could generally trim him out of a few dollars."
*904 Nor were long vacations neglected. Beginning in 1920, Kroger went to Florida every winter  generally leaving Cincinnati after the November elections and sojourning in the fair land of flowers through April. He acquired a winter home in Palm Beach. His habits on Florida vacations, as described by his son, were to arise early and start playing his "inveterate" golf between half past eight and nine in the morning. After his golf game, followed a sun bath and swim, then a home luncheon at 1 p.m. and a bridge game in the afternoon at the Old Guard Society, an organization of Palm Beach golfers whose prerequisite to membership was winter residence in Palm Beach for at least five consecutive years. After dining at home, he usually attended a show or intermingled socially with friends. He drove his own automobile, not only around town in Cincinnati but on long cross-country trips. After attaining three score and ten, Kroger was an unusually physically active man for one who had lived to that mellow age.
Though testimony concerning his frequent but nonconfining colds, quinsy sore throat, nontoxic substernal goitre and chronic constipation was received at the trial, the Tax Court found  and we think justifiably on the evidence  that at the time he created the trusts in issue, the decedent was in good health and was not motivated by any concern for his health.
Looking now to the situation of the Kroger family and the circumstantial setting in which the trusts were created, we observe that decedent's first wife, mother of his two sons and four daughters, had died in 1899. For nearly 29 years, he remained a widower. He was thoughtful of his children and very fond of his grandchildren. The whole Kroger family appeared well knit. They frequently gathered for Sunday night suppers. The patriarch manifested affection for his daughters and concern for their welfare. His friendliness toward his sons-in-law was manifest. To his sons he wrote affectionate letters, conferred with them concerning his investments and entrusted them with the keys to lock boxes containing the bulk of his wealth. His affection for them and confidence in them was deep.
But at age sixty-eight the dynamic Kroger became tired of his unmarried status. He decided to re-marry  to marry a lady much younger than he. The exact difference in ages is not definitely revealed in the record.
In the latter part of January, 1928, his son Chester and his daughter-in-law visited him in Palm Beach. About three days after their arrival, he informed Chester that he intended to marry and asked him what he thought of it.
"That is for you to decide," his son replied.
"What will your sisters think about it?" the father questioned.
"I don't know. I think they should feel the same way I do," Chester answered.
"That's all right. I would like to make a prenuptial agreement with Alice [the bride elect]," the elder Kroger announced.
The son demurred: "What do you want to do that for?"
The father replied that he did not want the bulk of his estate to go to his intended wife; he wanted his children and "own blood grandchildren" to have the benefit of it.
Chester Kroger testified that he disliked "the prenuptial agreement idea;" that it struck him as not amounting to much; and that it might get his father "in for a lot of lawsuits." He told his father that he should like to talk to the latter's successor as president of the Provident Savings Bank & Trust Company, Leo J. Van Lahr of Cincinnati, who was then in Florida at the Breakers Hotel. The suggestion was agreeable to his father. Chester immediately consulted the banker, who agreed that a prenuptial contract was inadvisable and suggested, in lieu, an irrevocable trust. The suggestion was passed on by the son to the father, who would not, at first, adopt it. The elder man seemed to fear that "he was irrevocably giving away money and had nothing to say about it." In some seven days, however, he became convinced that an irrevocable trust was the better plan and stated to his son that he had discussed the matter with "Alice" and "the arrangements were satisfactory to her."
Harley S. Hamilton, an attorney associated with the Trust Department of the Provident Savings Bank & Trust Co. of Cincinnati was directed to come to Palm Beach and, upon arrival, drafted the trust agreements. The attorney had no direct contact with the decedent until the occasion when the instruments were signed. At that time, he volunteered the opinion that *905 the execution of the trusts would not save any taxes. The Tax Court found that the evidence shows that the transfers were not made by the decedent for the purpose of avoiding either income or estate taxes.
The trust instruments were prepared by the Cincinnati attorney upon instructions from Chester Kroger as to irrevocability, trustees to be named, disposition of income and the like; but no direction was given the draftsman concerning the powers of the trustees and the reservation of powers by the trustor. The lawyer drew these provisions to effectuate his own understanding of the powers customarily vested in trustees.
Under the terms of the trust indentures, the trustees were required to pay the entire net income to the donor for life; and upon the donor's death to pay such net income to his surviving children in equal shares, and to the issue of any deceased child per stirpes. Upon the death of the survivor of the donor's children, the corpus was required to be distributed in equal shares to the surviving grandchildren of the donor, and per stirpes to the issue of any deceased grandchild.
The trust instruments provided further for authorization of the trustees to sell any part of the trust property upon the instructions or consent in writing of the donor during his life. Subject to like restrictions, the trustees were empowered to invest and reinvest in stocks, securities or real estate when deemed to the best interest of the estate.
In neither of the trust instruments did the donor retain any reversionary interest, contingent or otherwise, in the corpus of the trust estate. In neither of them did he retain any power of revocation or amendment. But he did retain the trust income for life for his own use.[1]
On March 3, 1928, two and a half weeks after the execution of the trust instruments with which we are concerned, the decedent, B. H. Kroger, married Mrs. Alice Farrington Maher at his winter home in Palm Beach, Florida. His son Chester and other members of the family attended the ceremony. The bridal couple, with the bridegroom driving the car, motored to the west coast of Florida for their honeymoon trip. In May, 1928, they went to Cincinnati and remained there until August 9, 1928, when they set forth upon a several months' tour of Europe. Before leaving Cincinnati, the decedent, on August 4, 1928, executed his last will and testament, in which, after providing for the payment of his debts and the disposition of his household goods, he bequeathed and devised one-third of the rest and residue of his estate to the Provident Savings Bank & Trust Co., in trust, with direction that the entire income of the trust should be paid to his wife, should she survive him. Upon her death, the corpus of the trust was made distributable by the trustee in accordance with the last will of the wife; or should she die intestate, the corpus was directed to be distributed in like manner as the rest and residue of the testator Kroger's estate.
The will provided that should the testator's wife elect to take under the statutes, "then and in that event," she should have out of his estate only such amount as may be provided by the statutes.
The residuary clause [item 11 of the *906 will] constituted as beneficiaries his children living at the time of his death, the issue of any deceased child to take per stirpes the interest of a deceased parent.
B. H. Kroger lived more than ten years after his second marriage. He did not die until July 21, 1938, at which time he was over 78 years old. He led an active life up to a short time before his death.
From the circumstances that at the time he created the trusts of February 13, 1928, the decedent was in good health and was motivated neither by concern for his health nor by a purpose to avoid income or estate taxes it does not follow that the finding of the Tax Court that he created the trusts for the purpose of barring his wife from any statutory rights in the property transferred to the trustees must be ignored.
It has been thoroughly understood since United States v. Wells, 283 U.S. 102, 51 S.Ct. 446, 452, 75 L.Ed. 867, that a transfer may be "in contemplation of death" within the meaning of revenue acts even though not induced by a fear that death is "near at hand." It is sufficient if contemplation of death is the inducing cause or dominant purpose of the transfer whether or not death is believed to be near. If the thought of death is the controlling motive prompting the disposition of property, the transfer is properly held to be made in contemplation of death.
In each case an issue of fact is raised. Colorado Nat. Bank of Denver v. Commissioner of Internal Revenue, 305 U.S. 23, 26, 59 S.Ct. 48, 83 L.Ed. 20. The crucial fact in the instant case has been resolved upon substantial evidence against the insistence of appellants. Cf. McCaughn v. Real Estate Land Title & Trust Co. et al., 297 U.S. 606, 608, 56 S.Ct. 604, 80 L.Ed. 879. The tax court found as a fact from the evidence which has been reviewed that underlying the creation of the trusts and the transfers of the twelve million dollars of treasury notes to the trustees was the "dominant motive" of the decedent to bar his future wife from any statutory rights of dower which she might have in his estate, "if she should survive him," and that "he could reasonably expect that she would for she was much younger than he was." It was soundly reasoned that inasmuch as the evidence showed that the decedent, not desiring his future wife to share with his children in the bulk of his fortune, was, when he created the trusts, contemplating his death. It may be assumed that he knew that if he survived his wife, the estate distributable to his heirs would not be diminished by the marriage.
We are not impressed with the hypertechnical argument of appellants based on distinction between the dower rights and other marital rights of the wife. The tax tribunal evidently used the phrase "statutory rights of dower" in a broad sense to embrace all rights, both real and personal, which a wife has in her husband's property under Ohio law.
From the fact that the decedent originally proposed to enter into an antenuptial agreement with his prospective wife, the inference is logical that from the beginning his intention was to bar her from all property rights upon his death, except such as should be incorporated into the marriage settlement agreement. In his will executed only a few months after the transfers in trust of February 13, 1928, the decedent recognized his wife's statutory rights of dower in all of his property which he had not transferred. Apparently, it was his purpose by these transfers to shut off his intended wife from statutory dower rights only in the property transferred and not in his remaining property.
That the decedent desired the "bulk" of his estate "to go" not to his wife-to-be but to his own children and grandchildren is uncontroverted. He had this in mind when considering the execution of a prenuptial agreement. Evidently, he was thinking of what his wife would receive at his death rather than of what she might obtain by divorce. No strength inheres in the argument that the decedent's mere contemplation of marriage establishes for the transfers a life motive associated with marriage rather than a motive to prevent his proposed marriage from interfering with the devolution of the bulk of his property to his children and grandchildren at his death.
In making the gifts of a million dollars to each of his children, the decedent was clearly motivated by a desire to confer these benefits on them during his lifetime. In marked contrast, his children and grandchildren could receive no benefit during his lifetime from the properties transferred in trust; for he reserved to himself, for life, the income from the trust estate.
As was said in United States v. Wells, 283 U.S. 102, 116, 117, 51 S.Ct. 446, 451, 75 L.Ed. 867, the dominant purpose of *907 the statute "is to reach substitutes for testamentary dispositions and thus to prevent the evasion of the estate tax." Chief Justice Hughes made it clear that the question of whether a transfer is within contemplation of death depends upon the state of mind of the donor. Death is "contemplated" if the motive which induces the transfer is of the sort which leads to testamentary disposition.
After the Commissioner of Internal Revenue has found that transfers in trust were made in contemplation of death, the taxpayer carries in the courts the burden of proving that the transfers were not so made. Wickwire v. Reinecke, 275 U.S. 101, 48 S.Ct. 43, 72 L.Ed. 184; McGrew's Estate v. Commissioner of Internal Revenue, 6 Cir., 135 F.2d 158, 160, and cases there cited; First Trust & Deposit Co. v. Shaughnessy, 2 Cir., 134 F.2d 940, 941. The Tax Court has found that this burden was carried successfully by appellants with respect to the absolute gifts by the decedent, on January 31, 1928, of one million dollars to each of his six children and with respect to the transfers in trust of January 21, 1928. See footnote 1, supra. But the Tax Court agreed with the Commissioner in his finding that the transfers in trust by the indentures of February 13, 1928, were made in contemplation of death. The rationalization of the Tax Court revealed the discriminating care with which the differentiation was made.
After careful search of the record in fulfilment of our responsibility as declared in Thal v. Commissioner of Internal Revenue, 6 Cir., 142 F.2d 874, 875, we have reached the conclusion that the Tax Court's findings rest upon solid, substantial factual ground. The findings of fact of the Tax Court being supported by substantial evidence, review in this court is limited to the question whether the decision of the Tax Court was arbitrary or erroneous as a matter of law. Updike v. Commissioner of Internal Revenue, 8 Cir., 88 F.2d 807, 812. No arbitrary or erroneous application of law by the Tax Court has been revealed.
True it is, as pointed out by appellants, that this court in Capitol-Barg Dry Cleaning Co. v. Commissioner of Internal Revenue, 6 Cir., 131 F.2d 712, 715, held that convincing testimony before the Board of Tax Appeals may not be arbitrarily disregarded. We adhere to the doctrine. The decision of the Tax Court, being deemed "contrary to the indisputable character of the evidence," was reversed. But the facts of that case bear no remote similarity to those found here.
All other authorities stressed by counsel for appellants have been thoughtfully studied. In the light of the opinion of the Supreme Court in Dobson v. Commissioner of Internal Revenue, supra, it seems probable that the reversal of the decisions of the Board of Tax Appeals (now the Tax Court) by Circuit Courts of Appeal in the cases cited below would not now be upheld on certiorari. Lippincott v. Commissioner of Internal Revenue, 3 Cir., 72 F.2d 788; Denniston v. Commissioner of Internal Revenue, 3 Cir., 106 F.2d 925; McGregor v. Commissioner of Internal Revenue, 1 Cir., 82 F.2d 948. With reference to Kaufman v. Reinecke, 7 Cir., 68 F.2d 642, 646, et seq., we find ourselves in accord with the dissenting opinion of Judge Evans.
Appellants insist that "alternatively if the transfers in question were made in contemplation of death, only to the extent of the interest in the property then transferred, namely, .69565, is the value of the property, at date of death, includible in gross estate."
The argument is rejected by the plain language of the statute, which provides that "the value of the gross estate of the decedent shall be determined by including the value at the time of his death [italics supplied] of all property, real or personal, tangible or intangible, wherever situated * * * (c) To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of * * * his death * * *."
In Milliken v. United States, 283 U.S. 15, 22, 51 S.Ct. 324, 75 L.Ed. 809, the Supreme Court asserted that Congress had adopted the well-understood system of taxation of transfers of property at death already in force in 42 states; and that a characteristic feature of the system was the imposition of a tax on gifts made in contemplation of death, "computed at the same value and rate as though the property given had been a part of the donor's estate passing at death." The contention of appellants is gainsaid by the principles of other Supreme Court decisions. In Helvering v. Hallock, 309 U.S. 106, 111, 60 S.Ct. 444, 447, 84 L.Ed. 604, 125 A.L.R. 1368, it was said with reference to section 302(c) of *908 the Revenue Act: "The taxable event is a transfer inter vivos. But the measure of the tax is the value of the transferred property at the time when death brings it into enjoyment." Cf. Central Hanover Bank Co. v. Kelly, 319 U.S. 94, 98, 63 S.Ct. 945, 87 L.Ed. 1282. See also Igleheart v. Commissioner of Internal Revenue, 5 Cir., 77 F.2d 704, 711.
No relevance is found in Robinette v. Helvering, 318 U.S. 184, 63 S.Ct. 540, 87 L.Ed. 700, stressed by appellants. The question there was whether there was a taxable gift of the remainders created in a trust instrument. The gift tax, not the estate tax, was involved in the controversy. The Supreme Court rejected the contention of the taxpayer that, inasmuch as at the time the trust was created there were no eligible remaindermen, there had been no taxable gift. The case furnishes no support to appellants' argument.
The decision of the Tax Court is affirmed.
NOTES
[1] It should be commented that the Commissioner of Internal Revenue determined a deficiency of $12,524,987.81 in the estate tax liability of the decedent, B. H. Kroger. After receiving evidence upon the contested issues, finding the facts and filing an opinion in the proceeding for redetermination of the deficiency, the Tax Court entered its decision reducing the deficiency determination to $8,647,700.89. The Tax Court held that gifts by the decedent of $1,000,000 to each of his six children on January 31, 1928, were not made in contemplation of death and were not a part of his gross estate, and also that the creation of a trust by instrument of January 21, 1928, with a contemporaneous transfer of property to trustees, was not done in contemplation of death. Inasmuch as these rulings of the Tax Court are not challenged or involved on this appeal, discussion of them seems inappropriate, except to say that the Tax Court found that the decedent made the absolute gifts to his children in order that they might receive training and experience in the handling of money, enjoy it while they were young, live comfortably, and educate their children; and that the Tax Court found that the trust of January 21, 1928, was created by the decedent to relieve himself from further personal appeals for financial aid by the beneficiaries, who were his relatives by consanguinity or affinity, toward whose support he had from time to time contributed. Moreover, none of the income from this trust was payable to the donor, nor did he retain any reversionary interest in the corpus or retain power of revocation.