ESTATE OF MAURICE FALK, DECEASED, LEON FALK, JR., AND EUGENE B. STRASSBURGER, SURVIVING EXECUTORS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 30311. Promulgated June 30, 1952.

*Louis Caplan, Esq.*, for the petitioner.
*Fortescue W. Hopkins, Esq.*, for the respondent.

700

### OPINION.

ARUNDELL, *Judge:* The first question before us is whether the decedent's transfer of securities in 1934, approximately 12 years before his death in 1946, was a transfer made in contemplation of death within the meaning of section 811 (c),[1] Internal Revenue Code. The question is one of fact. *Allen* v. *Trust Co. of Georgia*, 326 U. S. 630.

The transfer in 1934 of 1,000 shares of stock in the National Steel Corporation was in fulfillment of a promise incorporated in an antenuptial agreement executed in 1930 by petitioner and his prospective bride. At the time of the agreement, the decedent was a widower, 64 years of age, and was looking forward to his second marriage to a widow who had been a classmate and a life-long friend.

---

[1] Section 811 (c), as effective for the taxable years and prior to amendment in succeeding years, reads as follows:

SEC. 811. GROSS ESTATE.

The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States—

\* \* \* \* \* \* \*

(c) TRANSFERS IN CONTEMPLATION OF, OR TAKING EFFECT AT, DEATH.—

    (1) GENERAL RULE.—To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise—

       \* \* \* \* \* \* \*

        (A) in contemplation of his death. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this subchapter; \* \* \*

At all times until shortly before his death in 1946, the decedent was a cheerful, energetic, and mentally alert individual, who enjoyed excellent health, played golf regularly, made frequent trips, especially to Florida where he built a home in 1937, and participated in such sports as swimming and deep-sea fishing. In addition, he served as a director of several companies, attended board meetings regularly, participated in philanthropic activities and took an active interest in the Maurice and Laura Falk Foundation, referred to herein as the Foundation, a charitable organization he created in 1929.

Finally, it is significant that in 1930 the transferred property had a value of only $53,000, a relatively small sum when contrasted to the sum of $1,750,000 which represented the decedent's financial worth at that time, after having transferred to the Foundation securities worth approximately $10,000,000 in 1928.

In view of these and other facts set forth in our findings, we think it is clear that neither the thought of death nor the desire to avoid death taxes was the impelling cause for the 1930 agreement to transfer the securities.

The respondent nevertheless refers to the fact that the decedent's promise to transfer the securities was incorporated in the antenuptial agreement in which the decedent and Selma relinquished their interests as spouse in each other's property and concludes that the promise to transfer the securities was part consideration for Selma's release of her statutory interests as widow. From this premise, the respondent argues that the motive for the transfer was therefore a motive associated with death, which brings the transfer within the purview of section 811 (c) of the Code, citing *In re Kroger's Estate*, 145 F. 2d 901, certiorari denied 324 U. S. 866.

In *In re Kroger's Estate*, the Court of Appeals for the Sixth Circuit held that there was substantial evidence to support our finding that the transfers in question were for the purpose of barring the decedent's prospective wife from her statutory rights should she survive him, and were made in contemplation of death. In 1928 shortly prior to his marriage, the decedent had transferred in trust a material part of his property, consisting of Treasury notes with a face value of $12,000,000, and directed that the income be paid to the decedent for life, remainder to his children and grandchildren. The decedent's decision to transfer the property in trust was reached after several discussions with his children concerning his contemplated marriage to a woman many years his junior. The record left no doubt that the transfer was motivated by the decedent's desire to have the property pass at his death to his children rather than to the woman he planned to marry.

The decision reached in *In re Kroger's Estate*, *supra*, is not determinative here. In the instant case, the decedent-transferor was childless

and only a few years older than his prospective wife. Contrary to respondent's contention, the antenuptial agreement was initiated by Selma, not the decedent. Being a very independent person and possessed of sufficient financial wealth in her own right, Selma was anxious to have her financial affairs kept separate from those of the decedent so that she would not profit financially from the marriage and it would not be marred by any financial conflict. She was life beneficiary of a trust with a corpus valued at approximately $209,000 in 1930 which yielded an income of approximately $15,000 in that year, and she had only one descendant, a married daughter.

In entering into the antenuptial agreement, the decedent was motivated by a desire to satisfy the wishes of Selma and not by a motive associated with death such as an intent to bar her rights as his widow. The decedent's nephew, who was a close friend as well as business associate, testified that the decedent intended the transfer to be a wedding gift and we think the evidence establishes this intent. At the time of the agreement, the securities had a value of $53,000, which represented only about three per cent of the decedent's financial worth. It was not an improbable sum to be given to a wife as a wedding gift by a husband then worth approximately $1,750,000, after having transferred to a Foundation created in memory of his first wife securities worth in 1928 approximately $10,000,000 and, moreover, who gave to public charities sums far in excess of $53,000.

After considering the entire record, it is our view that the decedent's transfer of the securities was not impelled by the thought of death, the desire to avoid death taxes, or the desire to bar Selma's statutory rights as widow, and was not a transfer in contemplation of death within the meaning of section 811 (c) of the Code.

The second question, the amount to be deducted from the decedent's gross estate as a charitable bequest under section 812 (d), Internal Revenue Code, arises from the following facts: The decedent bequeathed his entire residuary estate to the Maurice and Laura Falk Foundation, an admittedly charitable organization within the meaning of section 812 (d), and left no legacy or bequest to his widow Selma.

On April 23, 1946, about five weeks after the decedent's death, his executors, by authority of the trustees of the Foundation, as residuary legatee under the decedent's will, agreed to pay Selma a sum sufficient to purchase annuity contracts which would provide for payment to her of $1,250 per month for life. The agreement to pay this sum, plus other property with a value of $9,450, which is not in dispute, was in consideration of her election [2] to take under the decedent's will and thus expedite the distribution of the estate.

---

[2] See Pennsylvania Wills Act of 1917, Act of 1917, June 7, P. L. 403, sec. 23 (a) and (b), as amended. (20 Purd. Stat. Ann., Appendix, secs. 261, 262, pp. 451, 452.)

The agreement provided for the purchase of "refund" annuity contracts which would refund to the Foundation the premiums unused, if any, at the time of Selma's death. The "refund" annuity contracts cost $223,455.88 which was $83,425.29 in excess of the cost of "no refund" annuity contracts that would have provided Selma with the same benefits but which would not have refunded the unused premiums.

The purchase of the "refund" annuity contracts at the additional cost of $83,425.29 was solely for the benefit of the Foundation. The agreement provided that the Foundation would be irrevocably designated as beneficiary.

The refund payable to the Foundation on April 24, 1946, was $223,455.88 (the total cost) and decreased quarterly by $3,750, the amount of the quarterly payments to the annuitant, Selma. If Selma lived for 15 years after April 24, 1946, no refund would have been available to the Foundation.

With these facts before us, the problem is to determine the value of the deductible residuary bequest to the Foundation. The petitioner argues that there should be included in the residuary estate the sum of $122,797 which allegedly represents the value of the Foundation's "remainder" interest in the refund annuity contracts or, alternatively, the sum of $83,425.29 which represents the cost of that interest. The respondent contends the interest is not deductible as a charitable bequest and gives as his reasons principles applicable to bequests of contingent remainders to charity. He argues, *inter alia*, that the value of the interests in the annuity contracts is not ascertainable and also that the possibility that Selma would live for 15 years after April 24, 1946, with the result that the Foundation would not receive any refund, was not too remote to be negligible. See *Merchants National Bank of Boston* v. *Commissioner*, 320 U. S. 256; *Humes* v. *United States*, 276 U. S. 487; *Newton Trust Co.* v. *Commissioner*, 160 F. 2d 175; *Boston Safe Deposit & Trust Co., et al., Executors*, 30 B. T. A. 679, appeal dismissed December 10, 1934; Regs. 105, sec. 81.44 and 81.46. In short, the parties center the issue on the valuation of the Foundation's interest in the refund annuity contracts.

However, as we understand the plan of the Federal estate tax, the problem does not require a valuation of the interest in the refund annuity contracts, as urged by the parties. The interest was not bequeathed by the decedent and was not part of his residuary estate but was instead an asset purchased by the Foundation [3] with funds received from the decedent's residuary estate.[4]

---

[3] The executors of the estate executed the agreement with the widow Selma and purchased the annuity contracts but they acted pursuant to authorization by the trustees of the Foundation as residuary legatee.

[4] One of the contentions of the petitioner was that the refund interest in the annuity contracts represented an investment of assets of the decedent's estate for the account of the Foundation.

The problem is to value the residuary estate, and that can best be done here by looking to what remained in the residuary estate after deducting from the gross estate all debts, expenses, legacies and bequests (other than the residuary bequest), including the property transferred to Selma in consideration of her election to take under the will. The issue, therefore, centers on what remained in the residuary estate after taking into account the sum expended for the benefit of Selma by reason of the agreement executed on April 23, 1946.

The starting point is the rule applied in *In re Sage's Estate*, 122 F. 2d 480, certiorari denied 314 U. S. 699. See also *Thompson's Estate* v. *Commissioner*, 123 F. 2d 816; Regs. 105, sec. 81.44. The Court of Appeals for the Third Circuit held, in *In re Sage's Estate, supra,* that a sum received by a widow from a charitable residuary legatee under a compromise agreement to procure her abandonment of a will contest was to be treated as a specific bequest contained in the will, and was not includible in the residuary estate as part of the deductible charitable bequest. The court stated that "what the widow received in settlement of the will contest, she took by 'inheritance' within the meaning of the Revenue Acts" and that what the charity received by inheritance was the residuary estate that remained after the payment to the widow.

The rule of the *Sage* and *Thompson* cases is that there is subtracted from the decedent's gross estate as a testamentary bequest the value of what the widow received in settlement of her will contest. She is deemed to have taken the property by "inheritance" within the meaning of the Internal Revenue Code. Applying that rule here, Selma received by "inheritance" certain property valued at $9,450 and an annuity valued at $140,030.59. Those sums are part of the total sum subtracted from the decedent's gross estate in determining the value of the residuary estate.

The additional sum of $83,425.29, representing the cost of the refund provision contained in the annuity contracts, was not expended for the benefit of Selma and did not represent anything of value to her. Selma's estate was not the beneficiary of the provision and Selma had no voice in designating the beneficiary. Her agreement with the executors specifically provided that the Foundation was to be irrevocably designated as beneficiary. Perhaps the trustees of the Foundation decided to purchase the refund provisions for the benefit of the Foundation after concluding that it offered a good opportunity for financial gain.

Therefore, the sum of $83,425.29, although expended in connection with the purchase of annuity contracts for the benefit of Selma, was not part of the consideration received by her and is not included in

the total subtracted from the decedent's gross estate. Instead, that sum remained a part of the gross estate and passed into the residuary estate. The sum would have passed either in the form of cash or securities to the Foundation as residuary legatee if it had not purchased the refund provisions and had instead purchased the no-refund type of annuity contracts.

It should be noted at this point that the Foundation received the interest in the refund provisions by purchase, not by inheritance. What it received by inheritance was cash or other property with a value of $83,425.29 which in turn was used by it to purchase the refund provisions. Since the interest in the refund provisions was received by purchase and not by inheritance, the value of the interest or the fact that it was subject to divestment by a nonremote contingency is not relevant in determining the value of the charitable bequest that is deducted from the decedent's gross estate.

We, therefore, hold that the deductible charitable bequest includes the sum of $83,425.29 which, pursuant to the authorization of the trustees of the Foundation, was used to purchase the refund provisions in the annuity contracts.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

RAUM. *J.*, concurs only in the result on the second issue.