Estate of Herbert Lee, Deceased, Miami Beach First National Bank, Executor v. Commissioner.
Estate of Herbert Lee v. Commissioner
Docket No. 32744.
United States Tax Court
1953 Tax Ct. Memo LEXIS 385; 12 T.C.M. (CCH) 83; T.C.M. (RIA) 53035; February 5, 1953
*385 Petitioner's decedent was a businessman who retired in 1934 and after his retirement purchased a farm in North Carolina containing something over 200 acres only a small portion of which was in cultivation and lived on it for awhile and tried to farm it with tenants. He constantly lost money on the venture and became tired of losing money on it and in 1940 moved to Florida. He induced a friend of his, who agreed to defray the expenses of maintaining the farm, to move there with his family and reside there. This friend also lost money and was threatening to turn the farm back to petitioner. In 1942 petitioner transferred the farm to this friend without consideration by fee simple deed with no conditions attached to the transfer. The transfer was made more than four years prior to decedent's death when he was 63 years of age and while he was in reasonably good health. The value of the farm was only a comparatively small proportion of decedent's gross estate. The Commissioner has determined that the transfer was made in contemplation of death and that the value of the farm at the time of decedent's death is includible in decedent's gross estate under Section 811 (c), I.R.C. *386 Held, the dominant motive of decedent in making the transfer to this friend who was no relative of his, was associated with life and not with death. The transfer was not made in contemplation of death and the value of the property is not includible in decedent's gross estate under Section 811 (c) of the Code. Jules G. Korner, III, Esq., and Stanley Worth, Esq., for the petitioner. E. M. Woolf, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The Commissioner has determined a deficiency in the Estate Tax of the Estate of Herbert Lee of $23,120.66. This deficiency is due to adjustments which the Commissioner made to the net estate for basic tax as disclosed by the return. These adjustments are shown in the *387 deficiency notice as follows: Net estate for basic tax as disclosed by return
$149,854.56
Additions to value of net estate and decreases in deductions: (a) Transfers
$40,000.00
(b) Charitable deduction
28,522.05
58,522.05
Net estate for basic tax as adjusted
$218,376.61
Net estate for additional tax as adjusted
$258,376.51
"Explanation of Adjustments to Net Estate "(a) It is held that decedent in his lifetime transferred by gift to another a certain farm known as 'Owl's Roost', situated in Guilford County, North Carolina in such form and manner as to require, in accordance with the provisions of section 811 (c) of the Internal Revenue Code, inclusion of the value as of date of decedent's death in the gross estate. "(b) It is held that the method of computing the deduction from the value of the gross estate for charitable, etc., bequests as employed by the internal revenue agent, and shown by him in the preliminary notice of deficiency, is correct." To this determination of the Commissioner petitioner assigned error as follows: "(a) Respondent erred by including in decedent's gross estate for federal estate tax purposes, *388 under the alleged authority of section 811 (c) of the Internal Revenue Code, the value of certain real estate which decedent had conveyed away during his life." Petitioner does not assign error as to adjustment (b) shown in the deficiency notice. At the hearing petitioner filed an amendment to the petition which reads as follows: "4b. Respondent further erred in failing and refusing to allow as deductions from the gross estate, administrative expenses and legal fees incurred in prosecuting this proceeding, which said expenses and fees had not been incurred at the time the estate tax return herein was filed." Findings of Fact Part of the facts were stipulated and as stipulated are adopted as part of our findings of fact. Decedent Herbert Lee, a citizen of the United States, died a resident of Miami Beach, Florida, on September 20, 1946. His will was duly admitted to probate in the county judge's court of Dade County, Florida, on October 16, 1946, and the Miami Beach First National Bank, the executor therein nominated, was duly qualified and appointed and brings the present appeal on behalf of petitioner. Decedent was born on August 20, 1879 and was *389 67 years of age at the time of his death. He had never married. Petitioner elected to value decedent's estate as of a date one year after decedent's death. Decedent's estate tax return was thereafter duly and timely filed with the collector for the district of Florida, showing an estate tax liability of $45,259.86. Decedent Herbert Lee, prior to his retirement, was in the cotton brokerage business. For a time the business was known as Lee-Franz Company. In the period immediately preceding his retirement, decedent, together with an associate named Ed Volmer, operated the cotton brokerage business as sole stockholders of the Herbert Lee Company, a corporation. The main office of the company was in New York, and a branch office was maintained in Chicago. Among others, the company did a large brokerage business for the Canton Cotton Mills, Canton, Georgia. In 1934, decedent decided to retire from business. He did not get along well with his associates, and he felt that he had made enough money to last him for the rest of his life. He did not retire on doctor's orders or because he was ill. He was in good health at the time he retired. Decedent retired by liquidating his brokerage *390 business, selling his largest account (with Canton Cotton Mills) to the Turner-Halsey Company of Worth Street New York City, under terms by which decedent was to receive one-fourth of future commissions earned by Turner-Halsey from the Canton Mills. Herbert Lee Co. was continued in existence to hold title to certain securities. Thereafter decedent was completely retired, and in the same year (1934) he moved to Greensboro, North Carolina, and took up residence at a farm a few miles from the city known as "Owl's Roost." The "Owl's Roost" farm originally contained about 300 acres. Some land was later sold so that thereafter the farm contained about 208 acres. There was a spacious and comfortable house containing five bedrooms, living room, dining room, den, kitchen and large porches. There was a large barn and three tenant houses. Decedent kept a tenant in one house, hired help in the second house, and used the third as a chicken house. The tenants (at one time decedent had two) helped to operate the farm. Only enough farming was done to raise food for the various animals on the place. Decedent had two horses, two or three cows, five or six dogs, 40 to 50 sheep, a flock of chickens *391 and a flock of pigeons at the farm. Also at one time decedent's close friend, R. W. Baker, kept seven horses and a man to take care of them at the farm; another friend also had three horses there at one period. The soil was quite poor and no more than 25 acres was under cultivation. No crops were raised for outside sale. Decedent never made for outside sale. Decedent never made money from the farm operation and it cost him from $500 to $600 a month to operate. Decedent was of a friendly nature. He liked activity and people and enjoyed hotel living. His principal recreations were going to the races and card playing. He was a man of restless and unsettled disposition and liked to move frequently. Decedent had never had a farm before. At first the place was a novelty to him and the various details of management interested him. He soon found out that there was more work and more expense in running a farm than he had anticipated. Constant personal supervision was required. Decedent was unable to find competent help to run the farm during the greater part of the year when he was not present. As time passed, the management of the farm became an increasing burden to him, and the large *392 expenses of operation began to worry him. Decedent had thought he would like country life, but this was not so. As the duties of management and the large operating expenses became increasingly burdensome to him, decedent lost his interest in "Owl's Roost." In 1940, he had come to the conclusion that he would leave the farm for good. He wanted to get rid of the place and remove the worry of management from his shoulders, and the bother and expense of bills arising each month. Around 1935, decedent became acquainted with Dr. Frank Sharpe of Greensboro, and his family. He first met the Sharpes at the home of R. W. Baker in Greensboro. As time passed, a close friendship developed between decedent and the Sharpe family. Dr. Sharpe was a specialist in obstetrics and gynecology, but decedent insisted that Dr. Sharpe be his personal physician. The Sharpe family was equally fond of decedent. Dr. Sharpe would go out to the farm to call frequently, and these calls would not be professional, or in response to a summons. Mrs. Sharpe went out to call frequently, taking the Sharpe children, and would run errands or do other favors for decedent. The Sharpes had three children - two girls and one *393 boy, Frank Sharpe, Jr. The latter was a particular favorite of decedent. Decedent had many friends, but few close friends. The Sharpes were among those few close friends. Dr. Sharpe did not bill decedent for many of his professional calls, as he would have any other patient. Decedent showed that he was fond of the Sharpes and expressed his appreciation to them. The Sharpes, and particularly the children, enjoyed visiting at the farm, and decedent seemed to take pleasure in their enjoyment. In the summer of 1939, decedent was planning to go away for the summer, and he invited the Sharpes to move out to the farm while he was away. They did so, but the night before decedent was to leave he caught cold and was sick for several days. During that period Mrs. Sharpe took care of him and brought him his meals. Decedent seemed very appreciative of the care Mrs. Sharpe gave him, and showed that he felt a sense of obligation and gratitude to them. In the spring of 1940, decedent had lost his interest in "Owl's Roost" and did not want to live there any longer. The expense and burden of operating and personally managing the farm had become distasteful to him, and he wanted to get rid of the place. *394 He also wanted to do something generous for the Sharpe family, who had been kind to him; he had discussed the matter of making some gift to Frank Sharpe, Jr., with his close friend, R. W. Baker. He had noticed that the Sharpes took pleasure in the farm and seemed to enjoy visiting there. In the early spring of 1940, decedent approached the Sharpes and asked them to take the farm over so that he could leave permanently. The Sharpes agreed. The arrangements agreed to were that the Sharpes would move to the farm and make it their permanent home, and were to bear all expenses of the place. The Sharpes could dispose of their home in Greensboro. Title would remain in decedent, but he stated that he would leave it to the Sharpes or one of them, in his will. Under this arrangement, the Sharpes moved to the farm on May 1, 1940, and decedent left Greensboro for New York, where he stayed about six weeks and then went to Florida and established residence there. The Sharpes sold their home in Greensboro. The Sharpes lived at the farm under this arrangement for two years. By that time they had become dissatisfied with their status at "Owl's Roost" and with the arrangement by which they lived *395 there. They found that the farm was very expensive to operate and that they were faced with making large capital expenditures to improve the soil. Extensive repairs to the buildings, including a new heating system and a new roof, were needed. The Sharpes realized that this large expenditure of money was upon a property which they did not own and to which they had no legal claim. They had only the statement of decedent that it would be left to them somehow in decedent's will. They did not expect decedent to die soon so that they could get title under this arrangement. The Sharpes knew that decedent was not on good terms with some of his family and they were afraid that decedent's family might break his will. The Sharpes realized that if that happened, the farm would be taken from them with no consideration of the money they had poured into the place, and they would be left without a home. The Sharpes were not related to decedent in any way. Dr. Sharpe accordingly approached decedent and disclosed to him their dissatisfaction and their unwillingness to continue under the existing arrangement. As a result of this discussion, decedent, on August 25, 1942, deeded "Owl's Roost" to Dr. *396 Sharpe in fee simple. There were no conditions of any kind embodied in this deed of conveyance. Federal and North Carolina gift tax returns were duly and timely filed by decedent showing the value of "Owl's Roost" to be $17,500, as determined by independent appraisers of the Greensboro Real Estate Board. Decedent paid North Carolina gift tax of $1,385 on account of the transfer. At the date of the gift decedent had just reached 63 years of age. Based upon respondent's valuation of $40,000, the "Owl's Roost" farm constituted only a small part, comparatively, of decedent's gross estate which he left at the date of death. In making the gift of "Owl's Roost" to Dr. Sharpe, decedent's primary motive was to rid himself of the burden of management and the expense of a property in which he had lost interest and to which he never desired to return. Secondarily, he desired to make a generous gift to the Sharpes for whom he had a feeling of affection and gratitude. He so expressed himself both before and after the gift to witnesses, who testified at the hearing of this case. He was not motivated by reasons of tax avoidance, and apparently never gave the tax effects of the gift any consideration. *397 At the time of the gift decedent was not settling his affairs or making distribution of his property in anticipation of death, and the "Owl's Roost" transfer was not made in the nature of a testamentary disposition. Decedent in later years referred to the farm as a "white elephant" and expressed himself as glad that he had gotten rid of the burden of "Owl's Roost" by giving it to the Sharpes in 1942. In the estate tax return filed by petitioner the cause of decedent's death and length of illness was stated to be "cerebral hemorrhage, massive with hemeplegea left, complete 7 days, due to arterial hypertension, 15 years, severe shock, etc." Decedent's gift of the "Owl's Roost" farm to Dr. F. A. Sharpe in August of 1942 was not made in contemplation of death or as a substitute for a testamentary disposition. Facts - Administrative Expenses Since the estate tax return herein was filed, petitioner has incurred additional expense in connection with the prosecution of this proceeding before the Bureau of Internal Revenue and in this Court. Such expenses consist of professional fees for the services of a certified public accountant, the local attorneys for the estate, counsel of record *398 in this Court, and the services of the Miami Beach First National Bank as executor. None of such fees had been disbursed at the date of the hearing, but were obligated by the petitioner, and must be paid. Out-of-pocket expense in connection with the prosecution of the controversy herein has been incurred and paid by petitioner in the amount of $341.88. An additional amount of out-of-pocket expense has been incurred on behalf of petitioner which has not yet been reimbursed by petitioner, but which petitioner is obligated to pay. Opinion BLACK, Judge: Two issues have been submitted to us for decision in this proceeding. They are: 1. Was the transfer by decedent Herbert Lee in the year 1942 of a farm in Guilford County, North Carolina, to a nonrelative who was a close friend such a transfer as to be includible in decedent's gross estate under the provisions of section 811 (c) of the Code? 2. Are the professional fees, commissions, and expenses incurred by petitioner in prosecuting the present controversy within the Bureau of Internal Revenue and in this Court deductible from decedent's gross estate? We will first take up issue 1. The applicable statute is 811 (c) of the Internal Revenue Code *399 printed in the margin. [1] The gift here in question was made more than four years prior to decedent's death. There is thus no statutory presumption under the statute which existed prior to decedent's death that the gift of the farm to Dr. Sharpe was made in contemplation of death. It is interesting to note that since the date of decedent's death Congress has amended the Internal Revenue Code so as to exclude gifts such as the instant one from the operation of section 811 (c). See I.R.C., section 811 (c) as amended by the Revenue Act of 1950. Also it is clear that the gift to Dr. Sharpe was not one "to take effect in possession or enjoyment at or after decedent's death" as those words are used in section 811 (c). The transfer of "Owl's Roost" to Dr. Sharpe in 1942 was by an unconditional fee simple deed and he became the owner outright of the property with no strings attached. There would be no basis to contend that the transfer of the property was to take effect in possession or enjoyment at or after decedent's death and respondent does not so contend. The basis of respondent's determination that the value of "Owl's Roost" farm should be included as a part of *400 decedent's gross estate is that the transfer to Dr. Sharpe in 1942 was made in contemplation of death. *401 The words "in contemplation of death" mean that the thought of death is the impelling cause of the transfer. It is the thought of death, as a controlling motive prompting the disposition of property which is the test. The statute does not embrace gifts inter vivos which spring from a different motive. The ultimate question is as to the state of mind of the donor, and the dominant motive prompting the gift must be determined in each case. United States v. Wells, 283 U.S. 102; Allen v. Trust Co. of Georgia, 326 U.S. 630. Contemplation of death "does not refer to the general expectation of death which all entertain; it must be a particular concern giving rise to a definite motive." Emma Peabody Abbett, 17 T.C. 1293. In all contemplation of death cases, the test is to determine the dominant and impelling motive which caused decedent to make the gift in question. This means the reason which was the most important or primary cause of the transfer. It is a question of fact in each case. Allen v. Trust Co. of Georgia, supra; Humphrey's Estate v. Commissioner, (C.A. 5, 1947) 162 Fed. (2d) 1, certiorari denied, 332 U.S. 817; *402 Emma Peabody Abbett, supra; Estate of Maurice Falk, 18 T.C. 699. The evidence of record in this case establishes to our satisfaction that decedent's dominant motive in giving "Owl's Roost" to Dr. Frank Sharpe was to rid himself of the burden of ownership of the farm. He had grown tired of living at the farm two years before the gift and had moved his residence to Florida. He never expected to return to the farm and he wanted to be relieved of the expense of operation and the burden of management, which he had never been able to delegate successfully to anyone else. According to the evidence the farm cost him $500 or $600 every month to operate. He accordingly invited the Sharpes to make the farm their home in 1940, when he left Greensboro. They had agreed with him to take care of the farm and pay all expenses. As long as the Sharpes were willing to live at "Owl's Roost" under this arrangement, decedent's purpose to rid himself of the burden of the place was satisfied. But the Sharpes became dissatisfied with the existing arrangement. They wanted to own the farm themselves if it was to be their home, and they became unwilling to continue spending large sums *403 in the upkeep and improvement of a place which was not theirs and which might never be theirs. They did not want to continue under the existing arrangement, Dr. Sharpe so informed decedent, and as a result decedent deeded the farm to Dr. Sharpe. The evidence is also convincing to us that decedent had a secondary motive in giving "Owl's Roost" to Dr. Sharpe, which is also a "life" motive. That motive was to satisfy a moral obligation which decedent felt to Dr. Sharpe and his family and to repay them for their many kindnesses to him over the years. Decedent was a single man with no immediate family. He liked company and enjoyed attention. He became fond of the Sharpes and they of him, and they were kind to him in many ways. Dr. Sharpe for a long period sent decedent no bills when he was called professionally. Mrs. Sharpe ran errands for him (decedent was lame and did not get about easily) and visited the farm frequently with her son, Frank, Jr., of whom decedent was particularly fond. Decedent saw that the Sharpe family was fond of the farm and enjoyed staying there. There is no contradiction of the record. It is firmly established by the evidence, we think, and respondent has introduced *404 nothing to rebut it. The Sharpes were not the natural objects of decedent's bounty in any sense and in normal course had no reason to expect anything from him. There is no evidence that decedent made any other gifts to the Sharpes, either inter vivos or by will, which could be called a testamentary plan in favor of the Sharpes. The above two motives of decedent are established by the testimony of the four people who were most intimately associated with him in the last ten years of his life. Their testimony is direct, unequivocal, and in our opinion credible. They are all disinterested witnesses; the outcome of this case will have no effect on them whatsoever. There is nothing in the record to discredit their testimony, and it cannot be disregarded. On the present record, there is no escape from the conclusion that Herbert Lee had two motives in giving "Owl's Roost" to Dr. Sharpe. In the order of their importance, they were: (a) to relieve himself of the expense and responsibility which the ownership of "Owl's Roost" entailed, and (b) to satisfy the feeling of obligation and indebtedness which he felt for his close friends, the Sharpe family. The evidence shows that at the time of *405 the transfer in question, decedent was in reasonably good health, considering his age, and there is no evidence which indicates that the transfer was made in contemplation of death. We have therefore found in our findings of fact that "Decedent's gift of the 'Owl's Roost' farm to Dr. F. A. Sharpe in August of 1942 was not made in contemplation of death or as a substitute for testamentary disposition." That finding of fact disposes of Issue 1 in petitioner's favor. Issue 2 - Administration Expenses At the trial, Frank Smathers, Jr., the vice president and trust officer of decedent's executor, testified as to the character of the obligations which had been incurred by petitioner in contesting this matter within the Bureau and in this Court. He testified that $341.88 of out-of-pocket expense has already been disbursed, but that none of the other items - attorney's fees, accountant's fees, compensation to the executor, further out-of-pocket expense (including the expense of bringing five witnesses to Washington from Connecticut, North Carolina, Georgia and Florida) had as yet been finally determined, and/or paid, although petitioner has contracted to pay such expenses and is obligated *406 to pay them. For this reason, the dollar amount of such expenses as have not yet been paid was not testified to, but was left open for computation under the Court's Rule 50, after the opinion herein is rendered. The statute which is applicable to this issue is printed in the margin. [2]
Rule 51 of the "Rules of Practice Before the Tax Court of the United States" provides: "If the parties in an estate tax proceeding are unable to agree under Rule 50, or under a remand, upon a deduction involving expenses incurred at or after the trial, the petitioner may move to reopen the case for further hearing on that issue provided it is raised in the petition or by amendment thereto." Respondent in his brief has made no mention of this issue *407 and we assume that he expects that it will be settled under a Rule 50 computation. If such does not turn out to be true then petitioner may move as provided in Rule 51, above quoted. Decision will be entered under Rule 50. Footnotes
1. SEC. 811. GROSS ESTATE. * * *
(c) Transfers in Contemplation of, or Taking Effect at Death. - To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death, or of which he has at any time made a transfer, by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death (1) the possession or enjoyment of, or the right to the income from, the property, or (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom; except in case of a bona fide sale for an adequate and full consideration in money or money's worth. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this subchapter; * * *↩
2. SEC. 812. NET ESTATE. For the purpose of the tax the value of the net estate shall be determined, in the case of a citizen or resident of the United States by deducting from the value of the gross estate - * * *
(b) Expenses, Losses, Indebtedness, and Taxes. - Such amounts - * * *
(2) for administration expenses, * * *
as are allowed by the laws of the jurisdiction * * * under which the estate is being administered, * * *↩