## PARISH'S ESTATE v. COMMISSIONER OF INTERNAL REVENUE.

### No. 10234.

United States Court of Appeals, Seventh Circuit.

Heard Jan. 30, 1951.

Decided Feb. 26, 1951.

Allin H. Pierce, Arthur Basse, Jr., and Bowen E. Schumacher, all of Chicago, Ill., for petitioner.

Theron Lamar Caudle, Asst. Atty. Gen., Ellis N. Slack, S. Walter Shine, Lee A. Jackson and Melva M. Graney, Sp. Assts. to the Atty. Gen., for respondent.

Before MAJOR, Chief Judge, and LINDLEY and SWAIM, Circuit Judges.

MAJOR, Chief Judge.

This is a petition to review a decision of the Tax Court of the United States, entered October 6, 1949, which determined a deficiency in petitioner's Federal estate tax in the amount of $14,876.72. The issue which the case presents, decided adversely to the petitioner, is whether certain gifts made by the decedent, William W. Parish, to his four adult children were made in contemplation of death within the meaning of Sec. 811(c) of the Internal Revenue Code, Title 26 U.S.C.A. § 811(c), which requires inclusion, in the gross taxable estate of a decedent, of an interest in property of which the "decedent has at any time made a transfer * * * in contemplation of * * * his death * * *." More specifically, the issue is whether the findings of the Tax Court upon which its conclusion was predicated are supported by substantial evidence, which embodies the further issue as to the competency of the evidence relied upon in support of such findings.

There is little, if any, dispute as to the voluminous findings made by the Tax Court other than those predicated upon alleged incompetent evidence offered by the respondent. The evidence heard by the Tax Court consisted of the testimony of six witnesses and eleven exhibits. Five of the witnesses were offered by petitioner, all of whom were personally acquainted with the decedent. They were two of decedent's sons, Varnum, a lawyer and the present administrator of the estate, and Anthony, cashier of the decedent's bank, John Hansen, a filling station operator who was a life-long friend of the decedent, William T. Garst, a cattle buyer in Kansas City who had known and done business with the decedent for about forty years and from whom the decedent purchased cattle about the time the gifts in controversy were made, and Charles H. Ruch, the attending physician during decedent's last illness. The sole witness offered by respondent, who testified over objection by petitioner, was William C. Maguire, a revenue agent who made an investigation of decedent's estate long after his death. This witness had no personal acquaintance with the decedent; in fact, he had never seen or talked to him. Of the eleven exhibits offered, six were presented by the petitioner and five by the respondent.

We shall first consider the undisputed facts embodied in the main in the findings of the Tax Court. The decedent, William W. Parish, was born in Momence, Illinois, August 25, 1855, and died there at the age of 89 years, October 15, 1944. The transfers in controversy were made by the decedent in the latter part of 1941, about three years prior to his death, as follows: On October 21, to each of his four children an undivided one-fourth interest in a number of properties, mostly real estate, of the value of about $36,000; on November 15, cash gifts to his three sons in the amount of $4,000 each; on December 2, cash gifts of $3,000 to each of said sons, and in December, a cash gift of $7,000 to his daughter for the purchase of an annuity.

The decedent was the founder and president of the Parish Bank and Trust Company of Momence, and engaged also in farming and the raising of livestock. At his death he was survived by a widow, Elizabeth Heck Parish, his second wife, who was about 70 years of age, and by four adult children of a prior marriage, to whom the transfers in question were made. The children consisted of three sons, Varnum, William and Anthony, whose ages at the time of the decedent's death were 63, 58 and 55 years respectively, and Carrie, an unmarried daughter, whose age at said time was about 60 years. All members of the family lived in Momence, the relationship among them was close and harmonious, and all business matters of major importance were discussed in family conferences.

Beginning in the year 1920, the decedent adopted a policy of making gifts to his children. His father had followed such a plan and decedent often remarked that he intended to pursue the same course. In that year he gave each of his children ten shares of bank stock. In 1923, he gave each of them 70 acres of land out of four separate farms, and promised to give them the remainder of such farms at a later time. In 1932, and again in 1933, he gave each of his sons ten shares of bank stock. In 1935 and 1939, he gave William forty additional shares of such stock, and in the latter year he also gave forty additional shares to each of the other sons. In the latter part of 1940, he gave to each of his four children the remainder of the farms from which he had given them the 70-acre tracts in 1923. Upon these gifts he filed a gift tax return showing their value at $33,500. (Respondent concedes that all gifts up to and including those made in 1940 were not made in contemplation of death.)

Decedent's program of making gifts to his children, commenced in 1920, was interrupted by the depression of 1929, which resulted in the closing of the Parish bank in 1931. He was much concerned regarding this event and felt a moral obligation to the depositors. He determined that they should be paid so far as his personal estate would permit. He so announced to his family, as well as at a meeting of

the depositors, and in statements published in the local paper declared his intention to see that all claims of depositors were paid.

The two sons, Varnum and Anthony, acting pursuant to their father's request, proceeded to formulate plans for reopening the bank, and the other son, William, was recalled from California where he then resided to assist in the work. The needed capital was obtained by placing mortgages on decedent's farms and by the sale of some real estate. The new bank opened on November 19, 1932; 60% of the depositors' claims were paid at that time, with a program by which the remaining 40%, or about $50,000, would be paid in the future. The liquidation of the old bank required some ten years and, by December 1941, every depositor in the reorganized bank had been paid *in toto.*

During the first two years of the bank reorganization, Anthony and William drew compensation of $50.00 per month. William deeded back to his father the 70 acres of land which had been given him in 1923, so that the farm could be mortgaged as a whole, and the other two sons and the daughter waived the rent of $700.00 per year, which the decedent had been paying them for use of their 70-acre tracts. Between 1932 and 1940, Anthony donated $1500.00 to the depositors' fund from his salary at the bank and also turned into such fund his dividends therefrom. The decedent often told his children that when the depositors were paid and the mortgages on his property satisfied, he intended to divide his property with them, and that the quicker they got this 40% paid the sooner he would be able to divide his property.

At the time the decedent made the gifts to his four children in the latter part of 1940, that is, the remainder of the four farms from which he had given them 70-acre tracts in 1923, the decedent told his children that he also intended to give them additional properties. He asked Varnum, who was a lawyer, to get together with the other sons and help him figure out how much property he should keep for himself and what property he should give to

his children. Varnum did nothing about it for several months, although he was urged by his father on four or five occasions in the spring and summer of 1941 to complete the arrangements, and he also urged Anthony in the same manner. In the summer of 1941, the decedent stated to Varnum, "I would like to have you [boys] get together and figure out this gift program right away; I might take a notion to get married and, if I did, it wouldn't be so convenient to transfer the real estate as it is now." He also told Varnum that he thought he ought to make the gifts, because otherwise his second wife might spend part of the property that he and his first wife had acquired. He never stated definitely to Varnum that he was going to get married but only that he might take a notion to do so. At that time the decedent was making his home with William, and the children learned in June 1941 that their father had become interested in Elizabeth Heck. He told William regarding his plans to get married, but, having heard him say nothing further about the matter, William thought that his father had given up the idea. In September 1941, determination was made as to the properties decedent would give to the different children. Varnum drafted the legal instruments, which were signed by his father October 20, 1941. These instruments effected the bulk of the gifts here involved, although as already noted, there are also included the additional gifts in cash in the amount of $7,000 made to each of his children in the following months of November and December.

We think it unnecessary to state in detail the description or value of property which the decedent still owned after making the gifts in controversy. It is sufficient to note that he owned livestock, bank stock and cash on deposit in banks in the value of about $50,000. It is perhaps also pertinent to note that decedent on October 20, 1941 (the same date on which he transferred the major portion of the property now in dispute) executed a trust agreement conveying real estate and personal property of a value of $115,000 to his three sons as "Trustees of the W.

M. Parish Estate." Under the terms of the trust, the decedent had the right to withdraw income or principal during his life up to a maximum of $10,000 per year, and also the right to alter or amend the trust and to remove additional property with the consent of the trustees, and upon his death any remaining principal was to be distributed to or for the benefit of his children. The taxability of this trust was conceded in the estate tax return and is not in dispute.

It may also be pertinent to note the financial condition of decedent's children. Excluding the gifts of 1940 and 1941, Varnum had a net worth of about $50,000. He had a family of seven children, two of whom were in college. Anthony owned his home and received a modest salary as cashier of the bank. William had nothing except what he earned, and Carrie, who was unmarried, had less than $5,000.

On December 29, 1941, the decedent married Elizabeth Heck, and took her to Florida on their wedding trip. Later he purchased and furnished a home in Momence. He said he did this because he was lonesome living with his son and wanted a home of his own. He placed the home in joint tenancy with his new wife and paid off a mortgage which she owed on a farm owned by her. As already noted, decedent's death occurred October 15, 1944. His widow was initially appointed as administratrix of his estate, in which capacity she served until August 9, 1945, when the son Varnum was appointed in her stead as administrator de bonis non.

We now turn to the condition of decedent's health at the time he made the gifts in controversy, as well as his activities and outlook upon life, concerning which the evidence furnishes no dispute. His health at that time was excellent. In fact, the report of the revenue agent states, "Investigation disclosed that the decedent was in excellent health for a man of his age when these transfers were made." Decedent was alert and active, had a happy disposition and appeared young for his years. He was greatly interested in travel and took numerous trips by airplane, motor car and train. He was independent in handling his affairs, drove his own car, acted as president of the bank and actively engaged in buying cattle and looking after his farms. In November 1941, shortly after making the gifts involved in this proceeding, he made a trip to Kansas City to buy cattle. He arose at 3 a. m., drove to Chicago and took an airplane to Kansas City, where he arrived at the stockyards at about 7:30 a. m. There he met a Mr. Garst, a cattle order buyer for John Clay & Company, from whom decedent had been purchasing cattle for forty years. Each of them spent the day in the stockyards astride a horse, during which time the decedent selected and bought two carloads of cattle. He was particular to select the grade of cattle most suitable for the kind of feed which he had. That evening he returned by airplane to Chicago.

Decedent never spoke of or indicated that he was making any plans for death or that he was disposing of any property with such a thought in mind. On the contrary, he was always planning for the future, talking about his farms, the acquisition of more cattle and the trip which he expected to take next. He often remarked that he was going to live longer than his father, who had lived to the age of 93 years.

Decedent's death (October 15, 1944) occurred approximately three years after his making of the gifts in controversy. His death resulted indirectly from a fall which occurred while he was getting into his automobile. He was confined to his bed for about four weeks, during which he developed a heart condition which, with other complications, caused his death. To the end, he talked of plans for business and travel and indicated that he expected to recover. The physician who attended him during his last illness testified that until the last few days decedent had no reason to apprehend imminent death. The Tax Court in its opinion stated, "In arriving at our conclusion above we have not considered that the decedent was unsound physically or mentally at the time of the gifts involved. We have set forth all of the facts in that respect but they do not justify any conclusion either that the de-

cedent's outlook on life in general or his physical condition caused fear of imminent death."

In summary, it is thus shown without dispute that the gifts involved were made about three years prior to decedent's death (gifts made in 1941, decedent died in 1944), so that the statutory presumption attaching to gifts made within two years prior to death is without application. The decedent, while advanced in years, enjoyed sound health and had remarkable vigor. Neither his attitude toward life nor his physical condition created any fear of imminent death. He had followed a policy of making gifts to his children for more than 20 years. The decedent was under strong moral obligations to his sons for their efforts and personal sacrifices in helping him to reopen his bank, pay off his depositors in full and save his property. He had promised them that when this work was done he would divide his holdings with them, and he kept that promise. He was anxious to be relieved of the burden of managing his diverse properties so that he would have more time to travel and enjoy the rest of his life. He wanted his children to have the use of the property before they were old and he often told them that he wanted them to enjoy it while he was living.

Under the rationale of United States v. Wells, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867, and Allen v. Trust Co. of Georgia, 326 U.S. 630, 66 S.Ct. 52, 90 L.Ed. 412, as applied to this undisputed factual situation, it is hardly open to question but that the gifts in controversy were not made in contemplation of death. And it appears from the Tax Court's decision, as well as the position of the respondent in this court, that on such facts no contrary contention would be advanced. But this is not all the case. The Tax Court in evaluating the entire factual situation relied mainly and we think almost exclusively upon testimony that petitioner urges was incompetent, and respondent in its brief relies upon the same testimony to sustain the Tax Court's decision. Respondent in its brief states: "The Tax Court's factual conclusion that the decedent's prime and dominant motive in making the transfer or gifts in issue was to bar his second wife from dower and other statutory rights in the property he had accumulated with the aid of his first wife was based principally upon the testimony of Revenue Agent William C. Maguire, who had been a revenue agent for 26 years at the time of the trial and investigated the decedent's estate." The Tax Court in its opinion states that in deciding the issue in dispute, it must "resolve a sharp conflict of evidence, between the evidence of two of the petitioner's [decedent's] sons who were transferees in the matter in question, together with affidivits made by the transferees and a letter by one of them, and statements both written and in testimony from the internal revenue agent who investigated the matter of the estate."

Thus, it is plain that respondent, as stated in his brief, relies "principally" upon the testimony of Maguire and that the Tax Court weighed the testimony of petitioner's witnesses against that of Maguire, and found a conflict which it resolved against petitioner and in favor of respondent. And it is petitioner's challenge to the competency of this testimony which presents the important and perhaps determinative issue on this review. True, the Tax Court placed some reliance upon other findings predicated in the main upon certain exhibits in the form of affidavits and letters, the competency of which is also challenged by petitioner. In oral argument before this court respondent made little, if any, effort to defend the competency of the testimony of Maguire but, contrary to the argument in his brief, sought an affirmance upon other findings based upon the alleged incompetent exhibits. In fact, counsel for respondent sought leave to retract the statement in his brief that the Tax Court's decision "was based principally upon the testimony of Revenue Agent William C. Maguire," but the attempted retraction is of no avail for the reason, as pointed out, that the Tax Court's decision plainly discloses that it was his testimony which was determinative of the result.

In 1945, about a year after decedent's death, revenue agent Maguire was assigned to investigate the estate and gift tax returns filed by the decedent's estate. In the summer of that year Maguire had a conference with decedent's sons, Anthony and Varnum, in Kankakee, Illinois. Maguire as a witness for the respondent was permitted to testify, over objection by petitioner, as to what was said in that conference, particularly by Varnum. Maguire testified that in response to his inquiry, Varnum stated that his father had told him (Varnum) that he was contemplating marriage and that he wanted to get his property in shape so that his second wife would not get any dower or other interest or any substantial share in that property after the marriage. At another point Maguire testified that he was told by Varnum that the decedent had stated that his purpose in making the gifts in question was to defeat all the right which the second wife might have in his property, and that he did not want her to have any interest in any property which he and his first wife had amassed. It is this testimony which furnishes the main premise for the Tax Court's decision and upon which respondent relies.

Maguire made no notes at the time of the conversation and in his original report to his superiors shortly after the conference made no mention of any dower or statutory interest having been referred to by Varnum.

Varnum Parish testified in rebuttal, and in substance reaffirmed his testimony in chief as to what had been told him by his father relative to the latter's purpose in making the gifts, but denied that he had told Maguire that the purpose was to bar the dower and statutory rights of the decedent's second wife. Thus, this case has been made to turn upon which version of the conversation between Maguire and Varnum is accepted. The testimony of Maguire was not offered for the purpose of impeaching that of Varnum Parish. The record plainly discloses that it was offered as substantive proof that the gifts in controversy were made by the decedent in contemplation of death. Respond-

ent in his brief states, "The fact that Maguire's testimony related to what the decedent had told Varnum does not make the evidence incompetent, for the self-deserving [self-serving] statements of a deceased person constitute an exception to the hearsay rule." The fallacy of this contention resides in the fact that the statements relied upon are not those of the decedent, self-serving or otherwise, but they are statements by Maguire (who had never seen the decedent) that he was told by Varnum what the latter had been told by the decedent.

Thus, we are treated to the novel contention that hearsay evidence twice removed is competent. If any court has ever so held or any text writer has ever so stated we are unaware of it. Respondent cites Hamel, Practice and Evidence before the United States Board of Tax Appeals (1938), p. 248; Wigmore on Evidence (3d ed.), Sec. 1364, p. 9, and Chicago Ry. Equipment Co. v. Blair, 7 Cir., 20 F.2d 10. None of these authorities, however, support respondent's theory. It is sufficient to note a statement in Hamel (page 294), "The Board will, upon objection, exclude hearsay evidence from the record. If witness A is called on to prove that B wrote or said something to him on the issue before the Board, the Board will decline to receive A's testimony, but will require that B be placed on the stand as a witness to repeat his assertions subject to cross-examination." And this court in Chicago Ry. Equipment Co. v. Blair rejected the contention that there was a conflict in the evidence and a question of credibility, where the proferred evidence was hearsay.

The Internal Revenue Code provides specifically, 26 U.S.C.A. § 1111, that proceedings before the Tax Court shall be conducted "in accordance with the rules of evidence applicable in the courts of the District of Columbia in the type of proceedings which prior to September 16, 1938, were within the jurisdiction of the courts of equity of said District."

In Dempster Mill Mfg. Co. v. Burnet, 60 App.D.C. 23, 46 F.2d 604, 606, the Court of Appeals of the District of Columbia stated, "The rules of evidence, in

a hearing before the Board of Tax Appeals, are not different than those applied to civil procedure in the courts, except that the statutes and regulations should be construed liberally in favor of the taxpayer."

The testimony of Maguire is so clearly incompetent that we need not further labor the point. It could have been received only for the impeachment of Varnum Parish, but as pointed out, no ground therefor was laid and it was not offered for that purpose. Moreover, even though it had been admitted on that basis it could not be treated as substantive evidence and would be without effect except insofar as it might affect the credibility or the weight to be attached to the testimony of Varnum Parish. And much of the documentary evidence received over petitioner's objection was incompetent for the same reason. No good purpose could be served in reviewing this testimony in detail for the reason, as already shown, that the Tax Court relied in the main upon the testimony of Maguire.

However, to illustrate the nature of this testimony and its incompetency, we shall make reference to a few of the exhibits. Under date of August 6, 1945, Maguire directed a letter to Varnum Parish in which he outlined his understanding of the conversation which they had previously had, and in which he requested certain additional information. It is significant to note that in this letter Maguire made no mention of anything having been said relative to dower or the desire of the decedent to defeat any right which his second wife might acquire in his property. Varnum responded to this letter on August 7, 1945, and went into considerable detail as to the circumstances under which the controverted gifts were made. At that time, Varnum was not the administrator of the estate and obviously, as respondent admits in his brief, statements by Varnum could not be treated "as admissions against the decedent's estate." On what theory Maguire's letter to Varnum or the latter's reply could have been properly received in evidence is not shown and we know of no legitimate basis for their admission. In

the same category is an affidavit made by Anthony Parish, and it must be kept in mind that all of these documents were offered as substantive proof and not for the purpose of impeachment, although there is some indication in respondent's brief that they are now relied upon for the latter purpose. Perhaps even a more glaring utilization of incompetent testimony is a lengthy quotation in the court's findings from an affidavit made by William Parish who was not a witness at the hearing. More than that, the affidavit was not offered in evidence. It appears that the affidavit of William was shown to Anthony during the latter's cross-examination. The quoted portion was read to Anthony, who was asked if the statement was true. In other words, it appears as an attempt to impeach Anthony by a statement in an affidavit by William who was not a witness. Such practice cannot be approved by any rule with which we are familiar.

We think we need not dwell further on the factual situation. As already shown, the decision in the instant matter could not be sustained on the competent and undisputed facts under the decisions of the Supreme Court heretofore cited. More than that, if we assume arguendo, contrary to what we have held, that Maguire's testimony was competent, we still think that the decision was erroneous. The Board in its opinion states: "If the decedent had primarily in mind, in making the transfers in question, his approaching marriage and the exclusion of his wife from dower or statutory interest in the property transferred, under Kroger v. Commissioner of Internal Revenue, 6 Cir., 145 F.2d 901, 905, such attitude comes within contemplation of death under section 811(c)."

The Kroger case is the sole authority relied upon in the Board's opinion; in fact, the instant proceeding appears to have had its genesis in the Kroger decision. The reason assigned by Maguire for his distinct recollection of his conversation with decedent's sons, Anthony and Varnum, was that he had studied the Kroger decision prior thereto, and it is not difficult to visualize that his prime purpose was to

obtain a statement which would bring the instant case within the rationale of that decision. But a reading of that case furnishes respondent, so we think, with little, if any, support. There, Kroger, the donor, had within a period of about three weeks made a series of gifts which fell into three principal classes: (1) a trust was created for the benefit of relatives, under which none of the trust income was payable to him and no reversionary interest or power of revocation was reserved; (2) gifts were made to each of his six children in the amount of $1,000,000 each, and (3) two trusts were created in which he reserved the entire net income for himself for life and under which the authority of the trustees to sell any part of the trust property was "upon the instructions or consent in writing of the donor during his life." These trusts were, admittedly, made as a substitute for a prenuptial contract, to give the donor all the benefits during his life and to prevent his intended wife, who had a higher life expectancy, from acquiring interest in the property at his death.

The Bureau of Internal Revenue had contended that all of these gifts were made "in contemplation of death"; but the Tax Court overruled the Bureau's claims except for the two trusts which were to take effect at death, and the Court of Appeals affirmed. In other words, the gifts enumerated in classes (1) and (2) were held by the Tax Court not to have been made in contemplation of death. See 145 F.2d 905, footnote 1. In distinguishing outright gifts from those which were to take effect only upon the donor's death, the court stated 145 F.2d at page 906: "In making the gifts of a million dollars to each of his children, the decedent was clearly motivated by a desire to confer these benefits on them *during his lifetime*. In marked contrast, his children and grandchildren could receive no benefit during his lifetime from the properties transferred in trusts, for he reserved to himself, for life, the income from the trust estate."

In the instant situation, the decedent as the donor made the transfers in controversy as outright gifts to his children,

and it must be remembered that the trust which he created at about the same time was included by the estate as taxable. And it can hardly be doubted that the transfers were made as a part of a plan which the donor had long followed in making gifts to his children. Moreover, they were made in accordance with a promise which the donor had made to his children. The most that can be said—but even this is doubtful—is that the specific time of making the transfers was accelerated by the donor's prospective marriage. In our view, the record leaves no room for doubt but that the gifts would have been made irrespective of marriage, which was merely incidental and in no sense the motivating force. The gifts, so we think, were plainly made in contemplation of life and not of death. Cf. Gillette's Estate v. Commissioner of Internal Revenue, 9 Cir., 182 F. 2d 1010.

The decision of the Tax Court is reversed and the cause remanded, with directions that petitioner's estate tax liability be recomputed in accordance with the law and this decision.