Estate of Hilda Beecher Stowe, David Beecher Stowe, Robinson Smith Beecher Stowe, and Katharine,jahn Cordes, Executors v. Commissioner.
Estate of Stowe v. Commissioner
Docket No. 4910-68.
United States Tax Court
T.C. Memo 1972-108; 1972 Tax Ct. Memo LEXIS 149; 31 T.C.M. (CCH) 432; T.C.M. (RIA) 72108; May 9, 1972, Filed. *149 Held: Certain disputed gifts made by Hilda Beecher Stowe, deceased, in 1963 and 1964, were not made in contemplation of death within the meaning of sec. 2035, I.R.C. 1954. Laurence F. Casey and Morris Orenstein, for the petitioners. Marion L. Westen, for the respondent. QUEALY
Memorandum Findings of Fact and Opinion QUEALY, Judge: The respondent has determined a deficiency in the Federal estate tax of the Estate *150 of Hilda Beecher Stowe, deceased, in the amount of $187,874.76. The issue to be decided in this case is whether certain transfers by Hilda Beecher Stowe in 1963 and 1964 were made in contemplation of death within the meaning of section 2035. [1]
Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. Hilda Beecher Stowe (hereinafter referred to as "the decedent") was born on October 11, 1883, and died testate on January 3, 1965, at the age of 81. The executors of her estate are David Beecher Stowe, Robinson Smith Beecher Stowe, and Katharine Jahn Cordes. The Federal estate tax return was filed with the district director of internal revenue, Manhattan, New York. At the time the petition was filed, the legal residences of David Beecher Stowe, Robinson Smith Beecher Stowe and Katharine Jahn Cordes were Darien, Connecticut; Scarsdale, New York; and Salisbury, Connecticut, respectively. The decedent was married to Lyman Becher Stowe, who predeceased her on September 25, 1963, at the age of 82. She had no brothers, but had one sister, Gertrude *151 Robinson Smith, who predeceased the decedent on October 22, 1963, at the age of 82. The decedent was survived by two sons, David Beecher Stowe (hereinafter sometimes referred to as "David"), born October 27, 1916, and Robinson Smith Beecher Stowe (hereinafter sometimes referred to as "Robinson"), born January 21, 1918. In addition, the decedent was survied by three grandsons, Charles Robinson Beecher Stowe, born July 18, 1949; Richard Mather Anthony Stowe, born April 2, 1953; and Henry Beecher Stowe, born April 27, 1964; and by a granddaughter, Ellen Robinson Stowe, born June 7, 1956. The three aforesaid grandsons are the children of David Beecher Stowe, while the granddaughter, Ellen Robinson Stowe, is the child of Robinson Smith Beecher Stowe. The decedent and her sister were the daughters of Charles Robinson Smith and Jeannie Porter Steele Robinson Smith. Mr. Smith, a practicing attorney and one of the founders of Allied Chemical Corporation (hereinafter referred to as "Allied Chemical"), died on September 7, 1930. Article Eleventh of the Last Will and 433 Testament of Charles Robinson Smith divided his residuary estate into five separate trusts consisting of three equal *152 one-quarter parts and two equal one-eighth parts of said residuary estate. One quarter of the estate of Charles Robinson Smith was left in trust for the benefit of his wife, Jeannie Porter Steele Robinson Smith. Upon her death, the income of such trust was to be paid to the decedent for the remainder of her life. A second quarter of the estate of Charles Robinson Smith was left in trust for the benefit of his wife, Jeannie Porter Steele Robinson Smith. Upon her death the income of this trust was to be paid to the decedent's sister, Gertrude Robinson Smith, for the remainder of her life, and upon the death of said sister the corpus of said trust was to be distributed as follows: * * * to such persons as Gertrude shall by will appoint; and in default of any valid appointment by her made, to Gertrude's next of kin then living. A third quarter of the estate of Charles Robinson Smith was left in trust for the benefit of the decedent's sister, Gertrude Robinson Smith. Upon her death, the corpus of this trust was to be paid "to Gertrude's next of kin then living." The decedent's mother, Jeannie Porter Steele Robinson Smith, died on April 7, 1945. On February 13, 1948, the decedent *153 gave to each of her sons 200 shares of Allied Chemical common stock, valued at $34,500, and cash in the amount of $2,000. The gift occurred only about five months after the marriage of her son, David Beecher Stowe, and he considered the gift as to him to be a wedding present. On March 4, 1954, decedent's sister, Gertrude Robinson Smith, execuc5d a trust agreement appointing herself and David Beecher Stowe as trustees. At that time she transferred into said trust shares of Allied Chemical common stock having a then aggregate value of approximately $97,000. The income of said trust was required to be applied for the use of David Beecher Stowe during his lifetime. On August 22, 1956, the decedent executed a trust agreement appointing Gertrude Robinson Smith and Peter V. D. Voorhees as trustees. She transferred into said trust 384 shares of Allied Chemical common stock having a then aggregate value of $40,032. The income of said trust was required to be applied for the use of her son, Robinson Smith Beecher Stowe, during his lifetime. On September 4, 1956, Gertrude Robinson Smith transferred to the above trust 200 shares of Allied Chemical common stock having a then aggregate value *154 of $20,575. On July 31, 1957, the decedent executed two trust agreements, naming herself and Gertrude Robinson Smith as trustees of each. One of the said trusts was for the benefit of David Beecher Stowe and his son, Charles Robinson Beecher Stowe, and is hereinafter referred to as "the David trust." The other was for the benefit of Robinson Smith Beecher Stowe and his daughter, Ellen Robinson Stowe, and is hereinafter referred to as "the Robinson trust." To each of the trusts she transferred 999 shares of Allied Chemical common stock having a then aggregate value of $181,318.50. The income of each trust was required to be paid to David and Robinson, respectively, during their lifetimes. During 1963, Robinson Smith Beecher Stowe incurred expenses in the approximate amount of $10,000 in connection with a separation and divorce from his third wife, Gunnel Borg. At that time the decedent, in conversations with her sons, indicated that she would help Robinson defray these expenses and David suggested that, in order to do this, she make a transfer to the Robinson trust. On August 20, 1963, the decedent transferred to the Robinson trust the amount of 1,297 shares of Allied Chemical *155 common stock having a then aggregate value of $64,850. Also on August 20, 1963, the decedent made an equalizing transfer to the David trust in the amount of 1,297 shares of Allied Chemical common stock having a then aggregate value of $64,850. Gertrude Robinson Smith died on October 22, 1963, after an illness of about one month. At her death the principal of the trusts established for her benefit under the aforesaid will of Charles Robinson Smith became distributable to the decedent as the next of kin to Gertrude Robinson Smith. These two trusts are hereinafter referred to collectively as the "Gertrude trusts." On January 14, 1964, the decedent executed a release which enabled the assets of the Gertrude trusts, less expenses in the total amount of $150,520.03, to be distributed to her immediately. As of December 10, 1963, such assets were as follows: 434 Market
Property
Value
31,400 shares, Allied Chemical com- mon stock
$1,748,587.50
616 shares, Chemical Bank New York Trust Co. capital
49,972.00
400 shares, Corn Products Co. com- mon stock
23,475.00
1,350 shares, General Electric Co. common stock
112,050.00
State of California 3 3/4% bonds, due 2/1/77
53,187.50
Chicago, Illinois, Water Revenue 4 1/4% bonds, due 6/1/78
55,375.00
Connecticut Expressway Revenue 4 1/4% bonds, due 1/1/97
54,187.50
Los Angeles, California, 3.90% bonds, due 6/ /86
53,875.00
Memphis, Tennessee, Board of Ed- ucation 3.70% bonds, due 10/1/81
53,000.00
New York City Housing Authority 3 3/4% bonds, due 1/1/97
5,050.00
New York City Housing Authority 3 3/4% bonds, due 1/1/99
15,450.00
St. Paul, Minnesota 3.20% bonds, due 2/1/89
48,750.00
Cash 188,483.60
Total $2,461,443.10
*156 At this time, the decedent's resources and income satisfied her needs. As the result of her sister's death and her consequent inheritance of the property of the Gertrude trusts, the decedent stood to receive a substantial increase in both her assets and income. The decedent was concerned over the additional income taxes which would result from her receiving the property of the Gertrude trusts. In November 1963, the decedent discussed her inheritance with her son, David, and an attorney, Mr. John Keeffe (hereinafter referred to as "Mr. Keeffe"), who had been contacted by David. Mr. Keeffe suggested that she might transfer the assets of the Gertrude trusts to new trusts for the benefit of her sons and thereby avoid such taxes. [2]
On March 11, 1964, the decedent executed a trust agreement, *157 naming her two sons and Mr. Carroll J. Dickson, an attorney, as trustees. At that time she transferred to said trust 14,500 shares of Allied Chemical common stock. The trust agreement provided for the payment of trust income to David Beecher Stowe for life and after his death for application of income as follows: (A) One-half thereof to or for the use, support and benefit of the widow, if any, of the said David Beecher Stowe, during her lifetime. (B) The balance thereof to or for the use, support and benefit of such of the lawful descendants of David Beecher Stowe as shall be living from time to time in equal shares, per stirpes, or if there are none, to or for the use, support and benefit of the Grantor's son ROBINSON SMITH BEECHER STOWE, or if he is not then living, to or for the use, support and benefit of such of his lawful descendants as shall be living from time to time in equal shares per stirpes, or in default thereof to or for the use, support and benefit of the widow of the said David Beecher Stowe. And further provided: FOURTH: This trust shall terminate on the death of the survivor of (a) the person who was the wife of David Beecher Stowe at the time of his death *158 and (b) all children and grandchildren of the Grantor who were living at the date of execution of this Trust Agreement. Upon such termination the Trustees shall transfer and pay over the then remaining principal of the trust, together with all net income then on hand or accrued, to the then living lawful descendants of David Beecher Stowe, or in default thereof to the then living lawful descendants of Robinson Smith Beecher Stowe, in each case in equal shares per stirpes, or in default thereof to the persons who would take the same had the said David Beecher Stowe died at that time, intestate, a resident of the State of New York, seized and possessed of the same. Also on March 11, 1964, the decedent executed a second trust agreement naming her two sons and John A. Keeffe as trustees. To the trust she transferred 14,500 shares of Allied Chemical common stock. The trust agreement provided for the payment of trust income to Robinson Smith Beecher Stowe for life and after his death for application of income as follows: (A) One-half thereof to or for the use, support and benefit of the widow, if any, of the said ROBINSON SMITH BEECHER STOWE, during her lifetime. 435 (B) The balance *159 thereof to or for the use, support and benefit of such of the lawful descendants of ROBINSON SMITH BEECHER STOWE as shall be living from time to time in equal shares per stirpes, or if there are none, to or for the use, support and benefit of the Grantor's son DAVID BEECHER STOWE, or if he is not then living, to for for the use, support and benefit of such of his lawful descendants as shall be living from time to time in equal shares per stirpes, or in default thereof to or for the use, support and benefit of the widow of the said ROBINSON SMITH BEECHER STOWE. And further provided: FOURTH: This trust shall terminate on the death of the survivor of (a) the person who was the wife of ROBINSON SMITH BEECHER STOWE at the time of his death and (b) all children and grandchildren of the Grantor who were living at the date of execution of this Trust Agreement. Upon such termination the Trustees shall transfer and pay over the then remaining principal of the trust, together with all net income then on hand or accrued, to the then living lawful descendants of ROBINSON SMITH BEECHER STOWE, or in default thereof to the then living lawful descendants of DAVID BEECHER STOWE, in each case in *160 equal shares per stirpes, or in default thereof to the persons who would take the same had the said ROBINSON SMITH BEECHER STOWE died at that time, intestate, a resident of the State of New York, seized and possessed of the same. These two trust agreements were drafted under the supervision of Mr. Keeffe, who was at the time a member of the law firm of Havens, Wandless, Stitt and Tighe. Mr. Carroll J. Dickson, a co-executor in the trust for the benefit of David, was a partner in said law firm. Hereinafter these two trust agreements are collectively referred to as "the 1964 trusts." The Allied Chemical stock transferred to the 1964 trusts consisted of the aggregate amount of 24,758 shares which the decedent had received as the remainderman of the Gertrude trusts, and 4,242 shares which had been received by the decedent at other times. The former stock had an aggregate basis of $30.784605 per share, while the latter had an aggregate basis of $11.27 per share (in each case this basis was computed before the adjustment for gift tax was considered). As of March 11, 1964, the date of the transfers, the Allied Chemical stock was valued at $55 per share, so that the total value of the *161 stock transferred was $1,595,000. On April 10, 1964, the decedent sold 1,000 shares of Allied Chemical common stock, and on April 27, 1964, she sold 5,600 shares of Allied Chemical common stock. The aggregate basis of the stock thus sold was $28.62 per share, and the decedent realized a gain thereupon in the total amount of $162,371.76. On March 11, 1964, the decedent also executed her Last Will and Testament. In said document, the decedent disposed of her residuary estate as follows: 1. As to one-half thereof (to be known as Trust A), I give, devise and bequeath the same to my Trustees, hereinafter named, IN TRUST, to hold the same during the joint lives of my son, DAVID BEECHER STOWE, and of his sons and my grandsons, CHARLES ROBINSON BEECHER STOWE and RICHARD MATHER ANTHONY STOWE, and of any hereafter born children of my said son who are born during my lifetime, and during the life of the survivor of them, and to apply the income thereof to the use of my son, DAVID BEECHER STOWE, so long as he may be living during the term of the trust, and after his death to apply one-half of the income to the use of his widow, if any, (and whether or not she remarries), and to apply the *162 other one-half of the income (or all the income if there is no widow or in the event of her death) in equal shares per stirpes to the use of his descendants from time to time surviving during the term of the trust, and upon the death of the survivor of my said son and my said grandsons, and of any hereafter born children of my said son who are born during my lifetime, to pay over the then remaining principal of the trust in equal shares per stirpes to the descendants then living of my said son, DAVID BEECHER STOWE, or if none then to my son, ROBINSON SMITH BEECHER STOWE, or if he is not then living then in equal shares per stipres to his descendants then living. 2. As to the other one-half thereof (to be known as Trust B), I give, devise and bequeath the same to my Trustees, hereinafter named, IN TRUST, to hold the same during the joint lives of my son, ROBINSON SMITH BEECHER STOWE, and of his daughter and my granddaughter, ELLEN ROBINSON STOWE, and of any hereafter born children of my said son who are born during my lifetime, and during the life of the survivor of them, and to apply the income thereof to the use of my son, ROBINSON SMITH BEECHER STOWE, so long as he may 436 *163 be living during the term of the trust, and after his death to apply one-half of the income to the use of his widow, if any, (and whether or not she remarries), and to apply the other one-half of the income (or all the income if there is no widow or in the event of her death) in equal shares per stirpes to the use of his descendants from time to time surviving during the term of the trust, and upon the death of the survivor of my said son and my said granddaughter, and of any hereafter born children of my said son who are born during my lifetime, to pay over the then remaining principal of the trust in equal shares per stirpes to the descendants then living of my said son, ROBINSON SMITH BEECHER STOWE, or if none then to my son, DAVID BEECHER STOWE, or if he is not then living then in equal shares per stirpes to his descendants then living. This Last Will and Testament was essentially the same as a prior will executed by the decedent on June 20, 1962. The decedent's aforesaid Last Will and Testament was drafted and its execution supervised by Mr. Voorhees, an attorney and close friend of the decedent. Mr. Voorhees was aware of the plans by the decedent for the trust agreements. *164 However, the will and the two trust agreements were prepared separately. On May 14, 1964, the decedent transferred cash in the amount of $3,000 to her newly-born grandson, Henry Beecher Stowe. On December 10, 1964, she made an additional transfer to said grandson of 50 shares of Sinclair Oil Company common stock with a then total value of $3,106.25. On November 2, 1964, the decedent transferred 54 shares of Allied Chemical Common stock, with a then total value of $2,712.88, to her sister-in-law, Hilda Stowe Donnelly, in order to help said sister-in-law, who had been ill, defray her rising medical expenses. During the last years of her life, the decedent was examined on a regular basis by Dr. Frederick T. Kirkham (hereinafter referred to as "Dr. Kirkham"). In 1961, the decedent complained to Dr. Kirkham of intestinal problems. Dr. Kirkham examined her and diagnosed the ailment as carcinoma of the sigmoid colon, which is a form of cancer. The decedent was not told at that time, or at any time thereafter, that she was suffering from cancer. On or about December 26, 1961, the decedent underwent surgery for this intestinal problem. Dr. George N. Cornell (hereinafter referred to *165 as "Dr. Cornell") performed the operation. Following the operation, which was termed successful, she was able to resume her normal activities. She continued until the time of her death to see Dr. Kirkham and Dr. Cornell concerning this malady, but there was never any evidence of a recurrence of the cancer and both Dr. Kirkham and Dr. Cornell considered her to be cured of the illness. The decedent, however, was troubled with frequent bowel problems during the last years of her life. Frequently she was given medication for this problem. She never indicated to her physicians that she thought the problem was due to cancer. During her visits with Dr. Kirkham, the decedent was sometimes given medication in order to lower her blood pressure. She also complained of loss of memory. However, as of March 1964, Dr. Kirkham considered the decedent to be in normal physical condition for a person of her age. The decedent evidenced no signs of senility to either Dr. Kirkham of Dr. Cornell. At no time did Dr. Kirkham limit the decedent in her traveling. The decedent's sister, Gertrude Robinson Smith, was also a patient of Dr. Kirkham until her death. The decedent did discuss her sister's physical *166 condition with Dr. Kirkham, but never expressed to him fear that she suffered from the same maladies as her sister. In March 1963, the decedent's husband was placed in a nursing home in Fairfield, Connecticut, where he remained until his death. His health regressed progressively during his stay at the home. During the last three months of his life he had completely lost his power of speech. During the last month of his life he could not even recognize his own sons. From the time he entered the nursing home up to his death, the decedent visited her husband at least once a week. The decedent did not appear to become uncommonly apprehensive of death following the deaths of her husband and her sister, although she did appear to become more devoted to her grandchildren. On October 11, 1963, the decedent celebrated her 80th birthday with her sons at the St. Regis Hotel in New York City, where she danced until 2 a.m. the following morning. On October 27, 1963, David and 437 his wife dined by invitation with the decedent at her apartment, and after dinner all three attended the theater. During each of the years at issue, the decedent had two homes. From early October until early *167 June she lived in an apartment in New York City. During the remainder of the year she resided at her home in Stockbridge, Massachusetts. During March 1964, the decedent traveled to California. While there, she wrote to her son, David, asking him to arrange for her to take her late sister's "box" at the Boston Symphony Tanglewood Festival for the forthcoming season. In December 1964, the decedent again traveled to Florida. There on January 3, 1965, she died of an "intracranial hemorrhage." In his notice of deficiency, the respondent included in the decedent's gross estate all of the aforesaid transfers made by the decedent in 1963 and 1964, determining that said transfers "were made by the decedent in contemplation of death and consequently are includible in the gross estate under section 2035 of the Internal Revenue Code of 1954." Opinion In August 1963 the decedent made a gift in trust to each of her sons of 1,297 shares of Allied Chemical common stock, the gift having a then aggregate value of $129,700. Later in 1963 the decedent's sister passed away. The decedent thereupon became the heir to her sister's trust estate of a value of approximately $2,461,000, *168 including 31,400 shares of Allied Chemical common stock. On March 11, 1964, the decedent made a gift of 29,000 shares of Allied Chemical common stock to two trusts, one for each of her sons. The respondent has determined that the gifts in trust to her sons in 1963 and 1964, along with certain other gifts made by the decedent in 1964 to her grandson and to her sister-in-law, constituted gifts made in "contemplation of death" within the meaning of section 2035. [3]
*169 In substance, the respondent's case rests primarily upon the statutory presumption of section 2035, coupled with the age and health of the decedent. In the recent case of Estate of Sumner Gerard, 57 T.C. - (March 13, 1972), we discussed the effect of the statutory presumption, stating as follows: The presumption is one of law, rather than fact. As such, it is not evidence in and of itself. Gillette's Estate v. Commissioner, 182 F. 2d 1010 (C.A. 9, 1950); Hemphill Schools, Inc. v. Commissioner, 137 F. 2d 961 (C.A. 9, 1943). However, the estate or party challenging the determination of the Commissioner must not only come forward with evidence that the gift is not made by the decedent in contemplation of death, Flannery v. Willcuts, 25 F. 2d 951 (C.A. 8, 1928), but must also carry the burden of proof. Once the evidence is in, it is for this Court to determine upon the basis of the record as a whole whether the gifts in question were made in contemplation of death. It is a subjective test. We must look to the decedent's state of mind at the time of the transfers. Since the decedent is never present to testify, we can only glean this from the *170 facts and circumstances in each individual case. Allen v. Trust Co. of Georgia, 326 U.S. 630 (1946); United States v. Wells, 283 U.S. 102 (1931); Estate of Verne C. Hunt, 14 T.C. 1182 (1950); Estate of Sumner Gerard, supra. This Court stated in Estate of Oliver Johnson, 10 T.C. 680, 688 (1948), that the criteria to be considered in determining whether a gift was in contemplation of death within the meaning of the statue should include the following: * * * (a) The age of the decedent at the time the transfers were made; (b) the decedent's health, as he knew it, at or before the time of the transfers; (c) the interval between the transfers and the decedent's death; (d) the amount of the 438 property transferred in proportion to the amount of property retained; (e) the nature and disposition of the decedent, e. g., whether cheerful or gloomy, sanguine or morbid, optimistic or pessimistic; (f) the existence of a general testamentary scheme of which the transfers were a part; (g) the relationship of the donee or donees to the decedent, i. e., whether they were the natural objects of his bounty; (h) the existence of a long established *171 gift-making policy on the part of the decedent; (i) the existence of a desire on the part of the decedent to escape the burden of managing property by transferring the property to others; (j) the eixstence of a desire on the part of the decedent to vicariously enjoy the enjoyment by the donees of the property transferred; and (k) the existence of the desire by the decedent of avoiding estate taxes by means of making inter vivos transfers of property. A careful consideration of these criteria in relation with the facts of the instant case leads us to the conclusion that the gifts in question were not made in contemplation of death as that term is used in the statute. The petitioner, therefore, has sustained the burden of proof. At the time of each of the disputed transfers the decedent's health was good. While the decedent underwent a major operation in 1961, at which time she was suffering from a form of intestinal cancer, her physicians considered her to be cured of this illness. She was not told that she had suffered from cancer, nor does it appear that she ever believed that she had so suffered. Cf. Estate of Samuel Want, 29 T.C. 1223 (1958). At no time did the *172 decedent ever indicate to her physicians or to her immediate family any overt concern or apprehension of impending death. Even following the deaths of her husband and sister, she showed no signs of melancholia. She continued to travel extensively and, as her time would allow, enjoyed an active social life. Indeed, at the time of her death, she was on a social visit to Florida. While the decedent was of advanced age at the time of the controversial gifts, her health and spirit negate such age as an important factor here. See Estate of Lillie G. Hutchinson, 20 T.C. 749 (1953); Estate of Oliver Johnson, supra; Estate of May Hicks Sheldon, 27 T.C. 194 (1956); Wishard v. United States, 143 F. 2d 704 (C.A. 7, 1944); Estate of Fletcher E. Awrey, 5 T.C. 222 (1945). Further, prior to the years in issue, the decedent made substantial gifts to her children. While not in itself determinative of the decedent's state of mind, this policy of giving on the part of the decedent is indicative of a life motive. Estate of Oliver Johnson, supra.See also United States v. Wells, supra; Parish's Estate v. Commissioner, 187 F. 2d 390 *173 (C.A. 7, 1951), reversing a Memorandum Opinion of this Court; English v. United States, 270 F. 2d 876 (C.A. 7, 1959); Estate of Amy H. Du-Puy, 9 T.C. 276 (1947); Estate of Fletcher E. Awrey, supra.
Any inter vivos gift will necessarily reduce the eventual estate tax. However, this does not necessarily mean that the gift was made with death motives. See Estate of Charles J. Rosebault, 12 T.C. 1 (1949). "A taxpayer is not obligated to arrange his affairs to insure the greatest yield possible for the tax gatherer." American Fletcher Nat. Bank & Trust Co. v. United States, 441 F. 2d 470 (C.A. 7, 1971). There is nothing in this record from which it might be inferred that the avoidance of estate taxes was an impelling motive in the making of these gifts. The gifts in question did not involve a major share of the decedent's original estate, as might be expected if made in contemplation of death. The major gifts in dispute herein are the transfers of Allied Chemical stock to the 1964 trusts. Shortly prior to these gifts the decedent had received an inheritance of a value of approximately $2,461,000, including 31,400 shares *174 of Allied Chemical common stock. The decedent already had sufficient resources to satisfy her needs, and this inheritance was substantially more than the decedent would ever need regardless how long she lived. Thus we have a widow, age 80, socially active, with a separate estate which was adequate to satisfy her needs. She becomes heir to the estate of her sister. What is more natural than that she should in turn give the resulting excess to her sons? The respondent argues that these transfers were testamentary in nature, citing Estate of Robert W. Hite, Sr., 49 T.C. 580 (1968). We find this argument unpersuasive. The transfers might be testamentary in nature in that the decedent did 439 not give her sister's estate to a stranger. In this respect, any and every gift to one's children is testamentary. This does not mean that the impelling motivation for the gift was the thought that death was near. In fact, if this were the case, the decedent would surely have given away more. We view as equally lacking in significance the fact that the decedent simultaneously had her personal attorney up-date her will. This was a normal act for one who was simultaneously making *175 a substantial gift to each of her sons. Indeed, it is an indication that she wanted to put her house in order to be free to pursue her private life. We note that in Estate of Anna Scott Farnum, 14 T.C. 884 (1950), acq. 1950-2 C.B. 2, this Court saw no signficance in the fact that the gifts sought to be taxed might be related in time to the execution of a will. The only basis, other than the statutory presumption, upon which we might reach the opposite conclusion, would be the age of the decedent. She was 80 years of age. While at that age death cannot be very far from one's mind, it is not the mere recognition of mortality which the statute seeks to tax. There must be something in addition. [4] It is that which is lacking in this case. Also at issue is the 1963 *176 transfer by the decedent of 1,297 shares of Allied Chemical common stock to both the Robinson and David trusts. The total stock transferred had a then aggregate value of $129,700. The desire "to recognize special needs or exigencies and to discharge moral obligations" for one's children is recognized as a motive inconsistent with the contemplation of death. United States v. Wells, supra at 119. See also Parish's Estate v. Commissioner, supra; Estate of Lillic G. Hutchinson, supra; Estate of Mary E. Cook, 9 T.C. 563 (1947). Here, this was certainly the dominant motive for the transfer. The fact that an identical transfer was made at the same time to her other son, David, is not unusual. This was merely a gift designed to equalize the amount given by the decedent to her immediate family and such gifts have been held to be a motive associated with life. Estate of Sumner Gerard, supra. See also Estate of John Moir, 47 B.T.A. 765 (1942); Estate of N. C. Foster, 25 B.T.A. 414 (1932); Estate of Carol C. Lynch, 35 T.C. 142 (1960). The other gifts at issue in this case are as follows: (1) On *177 May 14, 1964, the decedent gave cash in the total amount of $3,000, to her grandson, Henry Beecher Stowe; (2) On November 2, 1964, the decedent gave to her sister-in-law, Hilda Stowe Donnelly, 54 shares of Allied Chemical common stock with a then aggregate value of $2,712.88; (3) On December 10, 1964, the decedent gave to her grandson, Henry Beecher Stowe, 50 shares of Sinclair Oil Company common stock, with a then aggregate value of $3,106.25. These latter gifts form only a minute portion of the decedent's gross estate, and this fact alone is indicative of a gift not made in contemplation of death. See Flannery v. Willcuts, 25 F. 2d 951 (C.A. 8, 1928); Estate of Julius Selling, 24 T.C. 191 (1955); Kniskern v. United States, 232 F. Supp. 7 (D.C. Fla. 1964). In addition, however, the gifts by the decedent to her grandson were both made when the infant child was less than a year old, and the gift by decedent to her sister-in-law was made to aid said sister-in-law, who had been ill, in meeting rising medical costs. Decision will be entered for the petitioner. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. For the taxable years 1958 through 1963, the decedent reported taxable income and paid Federal and state income taxes in the following amounts: ↩
Taxable
Federal and State
Year
Income
Income Taxes
1958
$69,795.46
$35,065.38
1959
70,118.26
37,186.37
1960
67,026.49
34,828.37
1961
60,072.14
27,221.31
1962
54,937.13
36,983.67
1963
59,166.88
31,037.74
3. SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH. (a) General Rule. - The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death. (b) Application of General Rule. - If the decedent within a period of 3 years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, relinquished a power, or exercised or released a general power of appointment, such transfer, relinquishment, exercise or release shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section and sections 2038 and 2041 (relating to revocable transfers and powers of appointment); but no such transfer, relinquishment, exercise, or release made before such 3-year period shall be treated as having been made in contemplation of death.↩
4. As the Supreme Court enunciated in United States v. Wells, 283 U.S. 102, 117↩ (1931), in order for the statute to apply "Death must be 'contemplated,' that is, the motive which induces the transfer must be of the sort which leads to testamentary disposition." If the thought of death is not the "impelling cause" of the transfer, then it was not made in contemplation of death.